**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| CLEVE DUNN, JR., CHAUNA BANKS, DARRYL HURST, LAMONT COLE, CAROLYN COLEMAN, LAEL MONTGOMERY, EUGENE COLLINS, | |
| *Plaintiffs*, | Civil Action No. |
| v. | |
| EAST BATON ROUGE PARISH, CITY OF BATON ROUGE, EAST BATON ROUGE BOARD OF ELECTION SUPERVISORS, DOUG WELBORN, in his official capacity as the Clerk of Court for East Baton Rouge Parish, STEVE RABORN, in his official capacity as the Registrar of Voters for East Baton Rouge Parish, and NANCY LANDRY, in her official capacity as Secretary of State for Louisiana. | **COMPLAINT** |
| *Defendant*. | |

## INTRODUCTION

1.      The district map for the Baton Rouge Metropolitan Council, passed by a 7-5 vote in August 2022, dilutes Black voting strength in violation of the Voting Rights Act of 1965 ("VRA") and the United States Constitution.

2.      It does so by "packing" large numbers of Black voters into majority-Black council districts where they constitute an ineffective minority unable to participate equally in the electoral process.

3.      Although white voters are declining in numbers in Baton Rouge, the August 2022 map would *increase* the entrenchment of white control of the Metro Council by creating a new majority-white council district.

1

4.      The new map accomplishes that white entrenchment by packing more than 68.5% of the Parish's Black registered voters into 42% of the Parish's Metro Council districts.[1]

5.      In doing so, the Metro Council's white majority overrode their own demographer's recommendation, and chose a method of counting Black citizens that the United States Supreme Court has said is not appropriate.

6.      Plaintiffs – Black councilmembers and constituents – seek a judgment (i) declaring that the 2022 Metro Council map violates the Voting Rights Act and the U.S. Constitution, (ii) enjoining Defendants from conducting Metro Council elections using the enacted 2022 congressional map; and (iii) ordering Defendant to adopt a lawful council districting plan that complies with the Voting Rights Act in which Black citizens of Baton Rouge have an equal opportunity to elect candidates of their choice.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1357.

8.      This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

10.     Plaintiff Chauna Banks is a resident of East Baton Rouge, and a resident of and the Metro Councilperson for District 2.

11.     Plaintiff Darryl Hurst is a resident of East Baton Rouge, and a resident of and the Metro Councilperson for District 5.

---

[1] Map 4B.

12.     Plaintiff Cleve Dunn, Jr. is a resident of East Baton Rouge, and a resident of and the Metro Councilperson for District 6.

13.     Plaintiff LaMont Cole is a resident of East Baton Rouge, and a resident of and the Metro Councilperson for District 7.

14.     Plaintiff Carolyn Coleman is a resident of East Baton Rouge, and a resident of and the Metro Councilperson for District 10.

15.     Plaintiff Lael Montgomery is a resident of East Baton Rouge and District 1.

16.     Plaintiff Eugene Collins is a resident of East Baton Rouge and District 2.

17.     Defendants East Baton Rouge Parish, the City of Baton Rouge, and the Baton Rouge Metropolitan Council are governmental entities in East Baton Rouge Parish.

18.     Defendant Doug Welborn is the Clerk of Court for East Baton Rouge Parish.  "The clerk of court is the chief election officer of the parish." La. R.S. § 18:422.

19.     Defendant Steve Raborn is the Registrar of Voters for East Baton Rouge Parish. See La. R.S. § 18:58.

20.     Defendant East Baton Rouge Parush Board of Election Supervisors oversees the preparation for and conduct of all elections held in the parish. La. R.S. § 18:423(B).

21.     Defendant Nancy Landry is the Secretary of State for Louisiana and is sued in her official capacity.  The Secretary of State is the State's chief election officer.  La. Const. art. 4, § 7; La. R.S. § 18:421.  In that capacity, she is responsible for preparing and certifying the ballots for all elections, including elections for the Baton Rouge Metropolitan Council, promulgating all election returns, and administering the election laws.  *Id.*  As part of her duties, the Secretary of State also qualifies candidates for the Metro Council.  La. R.S. §§ 18:452, 18:462.

## LEGAL BACKGROUND

22.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A Section 2 violation is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

23.    The dilution of Black voting strength in violation of the Act "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Thornburg* v. *Gingles*, 478 U.S. 30, 46 n.11 (1986). These means of diluting Black voting strength are referred to respectively as "cracking" and "packing."

24.    The Supreme Court has identified three necessary preconditions for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) members of the minority group must be "politically cohesive" in their support of particular candidates; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51.

25.    Once these preconditions are established, the court must consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors, referred to as the "Senate Factors," that courts should

4

consider when determining if, under the totality of the circumstances, the operation of the districting plan results in vote dilution in violation of Section 2.

26.    The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 37. Additional factors which may be probative include (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Id.* While Section 2 does not establish a right to have members of a protected class elected in numbers equal to their proportion in the population, the Supreme Court has held that "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" in assessing whether Section 2 has been violated. *League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399, 426 (2006); *see also Johnson* v. *De Grandy*, 512 U.S. 997, 1000 (1994).

5

27.    The Supreme Court has identified factor 2 (the existence of racially polarized voting) and factor 7 (the extent to which members of the minority group have been elected to public office) as the most important factors in the totality of the circumstances analysis. *N.A.A.C.P.* v. *Fordice*, 252 F.3d 361 (5th Cir. 2001) (*citing id.* at. 48 n. 15).

28.    "There is no requirement that any particular number of [Senate] factors be proved, or that a majority of them point one way or the other."  *United States* v. *Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

29.    The Fifth Circuit has held that it will be "only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Clark* v. *Calhoun Cty.*, 21 F.3d 92, 97 (5th Cir. 1994).

## FACTUAL BACKGROUND

30.    Until 1949, the Parish of East Baton Rouge was governed by a police jury. The City of Baton Rouge constituted two wards of the parish and so was represented on the police jury.[2]

31.    At an election on August 12, 1947, the voters of both the parish and the city adopted a new Plan of Government. The plan, which went into effect on January 1, 1949 abolished the police jury and the city commission council. It extended the city limits and substituted a consolidated system of a mayor and council for city and parish.[3]

32.    On September 11, 1982, the citizens of East Baton Rouge Parish voted to amend the Plan of Government. The voters approved the consolidation of the city and parish councils into

---

[2] https://www.brla.gov/926/Why-We-Have-City-Parish-Government
[3] https://www.brla.gov/926/Why-We-Have-City-Parish-Government

one governing body called the Metropolitan Council. The Council members are elected from single member districts.[4]

33.    Within East Baton Rouge Parish are four cities - Baton Rouge, Baker, Zachary, and Central. Residents of these cities participate in Metro Council elections as well as local city council elections.

34.    The 2020 U.S. Decennial Census of Population and Housing confirmed that Baton Rouge is home to the second highest percentage of Black citizens in the state.  According to the 2020 Census, people of color represent 46 percent of Baton Rouge's population.

35.    Baton Rouge's population growth over the last decade was driven entirely by growth in minority populations. Its white population decreased.

36.    Every ten years, following the Census, the Metro Council must redraw district boundaries for the congressional districts.  La. Stat. Ann. § 18:1276.1; U.S. Const. art. I § 2.  Under federal law, council districts must have nearly equal populations and must not discriminate on the basis of race or ethnicity.

37.    The U.S. Census Bureau delivered apportionment counts for the 2020 Census on April 26, 2021.

38.    Between the 2010 and 2020 censuses, Baton Rouge's population grew by 16,610, or 3.8% percent, according to Census Bureau data.[5]

39.    Its Black population grew by 10,864 (or 5%) from 2010-2020. [6]

---

[4] https://www.brla.gov/926/Why-We-Have-City-Parish-Government
[5] From 440,171 to 456,781. *See* 2010: DEC Redistricting Data (PL 94-171); 2020: DEC Redistricting Data (PL 94-171)
[6] From 202,534 to 213,398 of any part Black. *See* DEC Redistricting Data (PL 94-171); 2020: DEC Redistricting Data (PL 94-171)

40.     The white population decreased by 18,858 (or 9%) in the same period.[7]

41.     The parish held six Redistrict Map Meetings, on February 22, April 27, June 22, June 29, July 27, and August 10, 2022.[8]

42.     Councilmembers were also alerted to the importance of complying with Section 2 explicitly in public discussions. At their August 11, 2022 Metro Council meeting several council members asked Mike Hefner, the demographer hired by the city-parish for the redistricting process, if the status quo proposal would run afoul of the federal Voting Rights Act.[9]

43.     Hefner declined to provide a direct answer, saying there was no direct formula to calculate what amount of minority population growth warranted the creation of a new majority-minority district.[10]

44.     In an undated memorandum to the Metro Council, Hefner made it explicit: "As discussed, Section 2 of the Voting Rights Act outlines the redistricting criteria we need to follow for redistricting purposes."

45.     Hefner provided the Council with a document entitled "Summary of E. Baton Rouge Metro Council Plan Demographics for Plans 4 through 8." For each plan, he identified how many proposed districts would have a Voting Age Population of mostly non-minorities, mostly minorities, or a "toss-up."

46.     Of all the plans, only Plan 4 and Plan 8 retained the seven white districts.

47.     In an undated memorandum to the Metro Council, Hefner acknowledged that

---

[7] From 214,927 to 196,069 of white alone. *See* DEC Redistricting Data (PL 94-171); 2020: DEC Redistricting Data (PL 94-171)

[8] https://www.brla.gov/1085/Live-Stream-Archived-Meetings

[9] https://www.wrkf.org/news/2022-08-11/baton-rouge-council-approves-status-quo-redistricting-proposal-despite-minority-population-growth

[10] https://www.wrkf.org/news/2022-08-11/baton-rouge-council-approves-status-quo-redistricting-proposal-despite-minority-population-growth

retaining seven white districts would not be "a fair representation of the Black population."

48.    He wrote: "It is my hope that Plan 6A may be a plan that has a fair representation of the Black population in the Parish and reflects the district configurations that many of you were seeking. Essentially this plan stands between the demographics of the current plan as reflected in Plan 4/4A and the additional majority-minority district added in Plan 7."

49.    On August 10, 2022, the Metro Council took up Ordinance 18596, an ordinance "APPROVING A REAPPORTIONMENT PLAN FOR THE METROPOLITAN COUNCIL IN ACCORDANCE WITH SECTION 2.01 OF THE PLAN OF GOVERNMENT, SAID PLAN TO BECOME EFFECTIVE JANUARY 1, 2025."

50.    A substitute motion was made by Councilmember Cleve Dunn, Jr. and seconded by Councilmember Coleman to adopt Map 7A with stated changes and amendments.

51.    All seven white members of the council voted to reject that substitute motion.

52.    A motion was then made by Councilmember Adams and seconded by Councilmember Amoroso to adopt Map 4B.

53.    All seven white members of the council voted to adopt Map 4B.

54.    Mayor-President Sharon Weston Broome decried the adoption of Map 4B, saying "My vision for Baton Rouge has always been for our city to be a community of peace, prosperity and progress . . . . The only way this is achievable is for us to commit ourselves to equity and social justice within our Parish, starting with the most fundamental right of equal representation."

### The *Thornburg* v. *Gingles* Preconditions Are Satisfied Here

55.    As applied here, the three preconditions outlined by the Supreme Court in *Thornburg v. Gingles*—the size and geographic compactness of Black voters in Louisiana; their political cohesiveness; and bloc voting by the white majority sufficient to usually defeat Black voters' preferred candidates—are readily satisfied, and strongly support the finding that

Louisiana's 2022 congressional map violates Section 2.

### *Gingles* **Precondition One: Size and Compactness of Black Voting Age Population**

56.     Baton Rouge's Black voters are sufficiently numerous and geographically compact to form a majority in six properly apportioned council districts in a 12-district plan.  Black voters make up almost 50 percent of Baton Rouge, and constitute more than enough voters to support the creation of six majority-Black districts that would allow Black voters to elect candidates of their choice.

57.     Compactness is unusually high in Baton Rouge, given that it is the 30th most segregated city in the entire United States, according to 2020 Census data.

58.     Size and compactness are evidenced by, among other things, the multiple maps proposed to the Metro Council during its consideration of the 2025 map that contain six majority black districts.  For example, on August 10, 2022, Councilmember Cleve Dunn, Jr. introduced Plan 7A; a map proposal containing six Black opportunity districts comprised of majorities of Black voters. That map is reproduced below.



E. Baton Rouge Metro Council
Plan 7A

59.    The detailed district break-downs for Map 7A are as follows:

| District | Ideal Value | Population | Deviation | % Deviation | White | % White | NH_DOJ_Blk | % NH_DOJ_Blk | 18+_Pop | 18+_Wht | % 18+_Wht | 18+DOJ_Blk | % 18+DOJ_Blk | RVTOTAL | RVWHITE | % RVWHITE | RVBLACK | % RVBLACK | RVOTHER | % RVOTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 38065 | 39895 | 1830 | 4.8% | 15961 | 40.0% | 21573 | 54.1% | 29302 | 12272 | 41.9% | 15392 | 52.5% | 26084 | 11386 | 43.7% | 13861 | 53.1% | 837 | 3.2% |
| 2 | 38065 | 36225 | -1840 | -4.8% | 8468 | 23.4% | 26582 | 73.4% | 27554 | 6904 | 25.1% | 19889 | 72.2% | 24105 | 6197 | 25.7% | 17315 | 71.8% | 593 | 2.5% |
| 3 | 38065 | 39470 | 1405 | 3.7% | 22208 | 56.3% | 9802 | 24.8% | 30531 | 18134 | 59.4% | 7137 | 23.4% | 24180 | 16340 | 67.6% | 5568 | 23.0% | 2272 | 9.4% |
| 4 | 38065 | 36546 | -1519 | -4.0% | 22369 | 61.2% | 9211 | 25.2% | 27276 | 17710 | 64.9% | 6151 | 22.6% | 22524 | 16591 | 73.7% | 4714 | 20.9% | 1219 | 5.4% |
| 5 | 38065 | 37427 | -638 | -1.7% | 2484 | 6.6% | 32962 | 88.1% | 27607 | 2127 | 7.7% | 24282 | 88.0% | 25271 | 1897 | 7.5% | 22544 | 89.2% | 830 | 3.3% |
| 6 | 38065 | 39827 | 1762 | 4.6% | 9869 | 24.8% | 23869 | 59.9% | 29936 | 8594 | 28.7% | 17022 | 56.9% | 19535 | 6389 | 32.7% | 11563 | 59.2% | 1583 | 8.1% |
| 7 | 38065 | 38053 | -12 | 0.0% | 9664 | 25.4% | 26174 | 68.8% | 29486 | 8213 | 27.9% | 19747 | 67.0% | 26030 | 7660 | 29.4% | 17362 | 66.7% | 1008 | 3.9% |
| 8 | 38065 | 36884 | -1181 | -3.1% | 17443 | 47.3% | 12886 | 34.9% | 28483 | 14718 | 51.7% | 9187 | 32.3% | 20695 | 13082 | 63.2% | 5866 | 28.3% | 1747 | 8.4% |
| 9 | 38065 | 39540 | 1475 | 3.9% | 24706 | 62.5% | 8745 | 22.1% | 30171 | 19934 | 66.1% | 6064 | 20.1% | 25714 | 19075 | 74.2% | 4748 | 18.5% | 1891 | 7.4% |
| 10 | 38065 | 37375 | -690 | -1.8% | 13085 | 35.0% | 21233 | 56.8% | 32382 | 12587 | 38.9% | 17252 | 53.3% | 18012 | 4364 | 24.2% | 12618 | 70.1% | 1030 | 5.7% |
| 11 | 38065 | 37256 | -809 | -2.1% | 24086 | 64.7% | 8372 | 22.5% | 30431 | 20493 | 67.3% | 6337 | 20.8% | 23103 | 17637 | 76.3% | 3984 | 17.2% | 1482 | 6.4% |
| 12 | 38065 | 38283 | 218 | 0.6% | 25726 | 67.2% | 7463 | 19.5% | 32453 | 22195 | 68.4% | 6124 | 18.9% | 22770 | 16949 | 74.4% | 4154 | 18.2% | 1667 | 7.3% |
| Totals | | 456781 | | | 196069 | 42.9% | 208872 | 45.7% | 355612 | 163881 | 46.1% | 154584 | 43.5% | 278023 | 137567 | 49.5% | 124297 | 44.7% | 16159 | 5.8% |

60.    Under this map, Council District 1 can be redrawn as a sixth majority-Black

opportunity district.  Council District 1 would have a Black voting-age population (BVAP) percentage of 52.5 percent,[11] which is sufficient for Black voters to elect a councilperson of their choice despite persistent racially polarized voting.

61.    Plan 7A comports with traditional redistricting principles and is narrowly tailored to comply with the Voting Rights Act.  Indeed, it does not differ much in appearance with the enacted map, Plan 4B, reproduced below:



---

[11] Per the NH_DOJ_Blk counting used by the Parish, which as discussed below, is underinclusive.

62.    Council District 1 in Plan 7A would therefore constitute a district in which the BVAP is sufficiently large and geographically compact to constitute a majority containing majorities of Black voters.  This map is more compact, and contains no precinct splits.

63.    Map 7A follows geographic features, such as the Comite River becoming a natural boundary between Districts 1 and 2.

64.    Plan 7A map represents just one of many ways to draw six majority-Black districts. In total, dozens of maps were introduced at the districting meetings.

65.    In a range of them, Black residents formed the majority of the voting age population demonstrating that Baton Rouge's Black voting-age population is sufficiently numerous and geographically compact to form a majority in two congressional districts.

### *Gingles* Precondition Two: Political Cohesiveness of Black Voters

66.    Black voters in Baton Rouge are politically cohesive.  Black voters vote for different candidates than the candidates preferred and supported by white voters.

67.    This is evident from the historical make-up of the Baton Rouge Metro Council. From 2009 to the present, despite elections, deaths, and mayoral appointments, there have been seven consistently-white-held council districts, and five consistently-Black-held districts:

| District | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Trae Welch | Brandon Noel | Brandon Noel | Brandon Noel | Brandon Noel |
| 2 | Ulysses Addison | Ulysses Addison | Ulysses Addison | Ulysses Addison | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks | Chauna Banks |
| 3 | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Chandler Loupe | Rowdy Gaudet | Rowdy Gaudet | Rowdy Gaudet | Rowdy Gaudet |
| 4 | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Scott Wilson | Aaron Moak | Aaron Moak | Aaron Moak | Aaron Moak |
| 5 | Ronnie Edwards | Ronnie Edwards | Ronnie Edwards | Ronnie Edwards | Ronnie Edwards | Ronnie Edwards | Ronnie Edwards | Erika Green | Erika Green | Erika Green | Erika Green | Erika Green | Erika Green | Darryl Hurst | Darryl Hurst | Darryl Hurst |
| 6 | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Donna Lewis | Cleve Dunn Jr. | Cleve Dunn Jr. | Cleve Dunn Jr. | Cleve Dunn Jr. |
| 7 | Denise Marcelle | Denise Marcelle | Denise Marcelle | Denise Marcelle | Denise Marcelle | Denise Marcelle | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole | Lamont Cole |
| 8 | Mike Walker | Mike Walker | Mike Walker | Mike Walker | Buddy Amoroso | Buddy Amoroso | Buddy Amoroso | Buddy Amoroso | Denise Amoroso | Denise Amoroso | Denise Amoroso | Denise Amoroso | Denise Amoroso | Denise Amoroso | Denise Amoroso | Denise Amoroso |
| 9 | Joel Boe | Joel Boe | Joel Boe | Joel Boe | Joel Boe | Joel Boe | Joel Boe | Joel Boe | Dwight Hudson | Dwight Hudson | Dwight Hudson | Dwight Hudson | Dwight Hudson | Dwight Hudson | Dwight Hudson | Dwight Hudson |
| 10 | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Tara Wicker | Carolyn Coleman | Carolyn Coleman | Carolyn Coleman | Carolyn Coleman |
| 11 | Alison Gary | Alison Gary | Alison Gary | Ryan Heck | Ryan Heck | Ryan Heck | Ryan Heck | Ryan Heck | Matthew Watson | Matthew Watson | Matthew Watson | Matthew Watson | Laurie Adams | Laurie Adams | Laurie Adams | Laurie Adams |
| 12 | Smokie Bourgeois | Smokie Bourgeois | Smokie Bourgeois | John Delgado | John Delgado | John Delgado | John Delgado | John Delgado | Barbara Freiberg | Barbara Freiberg | Barbara Freiberg | Jennifer Racca | Jennifer Racca | Jennifer Racca | Jennifer Racca | Jennifer Racca |

68.    This lines up exactly with the demographics of the Parish: the five consistently-Black-held districts are the ones that had a Black majority in 2020 census data.[12]  And the seven consistently-white-held council districts are the ones that had a white majority or plurality in 2020 Census data.[13]

69.    Precinct-by-precinct data shows that the racial composition of any of East Baton Rouge's 328 precincts predicts the vote share of a candidate in that precinct.

70.    For example, the following chart shows a straight-line relationship between the percentage of a precinct's registered voters who are white, and the percent of that precinct that voted for Donald Trump and Mike Pence in the 2020 presidential/vice-presidential election.

---

[12] https://www.brla.gov/801/District-Map-Demographics

[13] https://www.brla.gov/801/District-Map-Demographics





71.     The same is true for Black East Baton Rouge voters. The following chart shows a straight-line relationship between the percentage of a precinct's registered voters who are Black, and the percent of that precinct that voted for Joe Biden and Kamala Harris in the 2020 presidential/vice-presidential election.



Percent Black Voters in Precinct Predicts Kamala Harris 2020 Vote Share

### *Gingles* Precondition Three: Bloc Voting by White Voters

72.     In districts with a white majority, white voters vote as a bloc to usually defeat Black voters' preferred candidates.

73.     For example, in December 5, 2020, in Metro Council District 1, the white voters' preferred candidate, Brandon Noel, defeated the Black voters' preferred candidate Eric Lewis.

74.     Brandon Noel won 54% to 46%, mirroring the district's composition: 51.57% white, 41.99% Black, 6.43% other.

75.     In December 5, 2020, in Metro Council District 4, the white voters' preferred candidate, Aaron Moak, defeated the Black voters' preferred candidate Temika James.

76.     Moak won 70% to 30%, mirroring the district's composition: 60.15% white, 25.38% Black, 14.47% other.

77.     On November 5, 2020, in Metro Council District 8, the white voters' preferred

16

candidate, Denise Amaroso, defeated the Black voters' preferred candidate Wendell Piper.

78.    Amaroso won 56% to 44%, mirroring the district's composition: 43.96% white, 37.54% Black, 18.49% other.

79.    In congressional races, too, voters in many of Baton Rouge's majority-white districts had a choice between Black and white congressional candidates.  White voters voted as a bloc to defeat the Black-preferred candidates.

80.    For example, in the 6th Congressional District, the white voters' preferred candidate, Garret Graves, defeated the Black voters' preferred candidate, Daw Williams.

81.    Graves won 61% to 35%, mirroring the district's composition of 71.2% white, 23.5% Black, and 5.3% other.

82.    Multiple courts have recognized that such stark patterns of racially polarized voting—referring to both the political cohesiveness of Black voters and bloc voting by white voters—has been a consistent feature of Baton Rouge's political landscape, and that it continues to pervade statewide and local elections today.

**Under the Totality of the Circumstances, H.B. 1/S.B. 5 Violate Section 2 of the VRA**

83.    The factors enumerated in the Senate Judiciary Committee Report to the 1982 amendments to the VRA ("Senate Factors")—including, but not limited to, Louisiana's history of official voting-related discrimination, the extent to which Black residents bear the effects of discrimination, the use of racial appeals in political campaigns, and the underrepresentation of Black elected officials in the state—likewise weigh in favor of finding that the 2022 congressional map violates Section 2.

### Factor 1: History of Official Voting-Related Discrimination

**a. Suppression Targeting Black Voters Before the Voting Rights Act**

84.    Louisiana has a long, deeply entrenched history of voting-related discrimination. Throughout its long history of chattel slavery, only white people possessed the right to vote. "Disenfranchisement of blacks as an acknowledged state policy pre-dates the Civil War.  Even free blacks who were property owners were denied the right to vote.  Most blacks, consequently, even while ostensibly 'free,' remained enslaved, bereft of one of the most basic of human rights— the right to vote."  *Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987).

85.    Even after the Civil War and Reconstruction, Black people were systematically denied the right to vote in the decades that followed.  Although the emancipation of slaves and the post-Civil Reconstruction period brought change—including the first Black people elected to state office—that initial progress was swiftly reversed after the federal government ceased to monitor state government starting in 1877.  Black people's efforts to vote in the nineteenth and twentieth centuries were suppressed through extreme racial violence and targeted state actions, such as frequent public lynchings, the enactment of a grandfather clause, a poll tax, literacy tests, voter roll purges, and discriminatory changes to state and local maps during redistricting.

86.    In 1898, Louisiana lawmakers convened a constitutional convention to update the state constitution, with the explicit goal of enforcing white supremacy and disenfranchising Black people.  At that convention, the state established the "grandfather clause," a constitutional provision, common to post-Reconstruction states in the former Confederacy, imposing onerous property and education requirements on prospective voters, but waiving those requirements for registrants whose fathers or grandfathers had been registered to vote before 1867—all of whom, of course, were white.  The president of the Constitutional Convention at which the clause was

adopted openly acknowledged that its purpose was to "let the white man vote" and to "stop the negro from voting."

87.    These and other state-sanctioned voting restrictions were frequently supplemented by systemic violence against Black Louisianans to intimidate and prevent them from exercising the franchise and to entrench white supremacy.

88.    In 1868 alone, more than 1,000 people—most of them Black—were killed in massacres and lynchings.

89.    This widespread violence took place with the implicit and explicit approval of State officials.

90.    Louisiana parishes comprised four out of five local jurisdictions in the United States that had the most lynchings between 1877 and 1950, including 549 documented lynchings in that time period.

91.    In the 1873 "Colfax Massacre," a white mob massacred approximately 150 Black residents in Colfax, Louisiana after a close gubernatorial race.

92.    Anti-Black violence was almost never punished by law enforcement or the courts.

93.    In the twentieth century, the State continued to develop ways to discourage Black Louisianans' participation in the political process and to suppress their effective voting power.  It implemented an "understanding" clause requiring citizens to "give a reasonable interpretation of any section of the federal or state constitution in order to vote."  *Bossier Par. Sch. Bd.* v. *Reno*, 907 F. Supp. 434, 455 (D.D.C. 1995) (Kessler, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted), *vacated on other grounds*, 520 U.S. 471 (1997). It levied poll taxes and purged Black voters from registration rolls.

94.    In 1923, the State authorized an all-white Democratic Primary, which "functioned

to deny [Black voters] access to the determinative elections." *Major*, 574 F. Supp. at 339-40. In the 1950s, Louisiana implemented citizenship and "morals" tests, and anti-single shot voting provisions (the latter designed to minimize the ability of minority voters to effectively marshal their voting power in multimember districts). In 1959, the Legislature established a majority-vote requirement for election to party committees that impeded minorities from obtaining fair representation on those committees.

95.    Louisiana's voting restrictions achieved their intended effect. The restrictions imposed in the late nineteenth century, including the grandfather clause, "reduce[d] black voter registration [in the state] from approximately 135,000 in 1896 to less than 1,000 in 1907." *Major*, 574 F. Supp. at 340. From 1910 until 1944, less than 1 percent of Louisiana's voting-age Black population was registered to vote. By 1948, the percentage of Black registered voters stood at 5 percent. By 1964—nearly a century after Black people received the right to vote—only about a third of Louisiana's Black voting-age population was registered to vote, compared with the overwhelming majority of the white voting-age population.

**b.  Continued Efforts After the Voting Rights Act to Minimize Black Voting Power**

96.    In 1965, Congress passed the VRA, and Louisiana, as a result of its history of disenfranchising Black voters, was declared a "covered" jurisdiction under Section 4(b) of the Voting Rights Act. *See South Carolina* v. *Katzenbach*, 383 U.S. 301, 312-13 (1966). As a covered jurisdiction, Louisiana was required under Section 5 of the Act to have any changes to its election practices or procedures precleared by the U.S. Department of Justice or a federal court.

97.    Even after the passage of the VRA, Baton Rouge continued its efforts to discourage Black voting by diluting Black voting strength.

98.    That same year, the Legislature also attempted to limit Black influence at the state

level by approving a plan to reduce the number of majority-minority State House of Representatives districts throughout the state, including Orleans Parish and East Baton Rouge Parish.  The DOJ objected to the plan, noting that it "impact[ed] adversely upon black voting strength."  As a result of the DOJ's objection, the plan did not become effective.

99.    Efforts by  infected the initial districting of the Metropolitan Council

100.    On February 22, 1983, the United States Department of Justice wrote a letter about the amendment of the Plan of Government to create the Metro Council:

> The proposed change before us would allow for the election of twelve members from twelve single-member districts, three of which have black majorities. However, all twelve council members would vote on all affairs in the parish, including city matters. Thus, concerning affairs of the City, where most of the blacks are located, the potential black representation would change from three out of seven members to three out of twelve members, resulting in an <u>impermissible retrogression of the position of blacks voters in the City of Baton Rouge</u>. *Beer v. United States*, 425 U.S. 130 (1976).

101.    Even at the outset, the Metropolitan Council districts showed evidence that the DOJ considered to be "unnecessary packing of the black population into proposed District No. 2 (96.04%) and No. 7 (88.27%)."

102.    The result was "an overall minimization of the voting strength of black residents in the Baton Rouge area which has a discriminatory effect within the meaning of Section 5 of the Voting Rights Act, as amended, 42 U.S.C. 1973c."

103.    In 1991, the DOJ objected to a subsequent State House redistricting plan, noting that in at least seven areas the proposed plan minimized Black voting strength.

104.    The State has similarly faced successful challenges to proposed changes to other election positions, such as state court judges and school boards, that would discriminate against Black voters.  No fewer than six times between 1969 and 1994, Louisiana attempted to add at-large or multi-member judicial seats, over the objections of the DOJ.  *See, e.g.*, *Clark* v. *Roemer*,

21

777 F. Supp. 445 (M.D. La. 1990). The consent decree in the line of VRA cases stemming from *Clark* v. *Roemer* ultimately established majority-minority subdistricts in nine district courts, a family court, and a court of appeal circuit, and required the Legislature to create such subdistricts in another court of appeal circuit and several other district courts. A separate line of cases challenging the election system for the Louisiana Supreme Court under the VRA resulted in the *Chisom* decree, which allowed the first Black justice to be elected to the Louisiana Supreme Court.

105.    The State currently faces a separate Section 2 challenge to its single-member districts for state supreme court elections. *See Allen* v. *Louisiana*, No. 3:19-CV-00479.

106.    Louisiana has also failed in recent years to comply with public assistance agency voter registration requirements under the National Voter Registration Act (NVRA), a failure that disproportionately impacts Black residents of the state. *See Scott* v. *Schedler*, 2013 WL 264603, at *18 (E.D. La. Jan. 23, 2013) *aff'd in part, vacated in part on other grounds*, 2014 WL 5801354 (5th Cir. Nov. 5, 2014).

### c.    White Officials in Baton Rouge Worked to Suppress Black Office-Holding and Black Participation in Political Advocacy

107.    In 1961, Black citizens of Baton Rouge gathered to speak out against racial inequality and law enforcement misconduct. Baton Rouge police arrested an advocate, Reverend Cox, for alleged legal violations including "Obstructing a Public Passageway." In *Cox v. Louisiana,* 379 U.S. 536, 558 (1965) ("*Cox I")* it was "clear" that Baton Rouge law enforcement committed an "unwarranted abridgment of [the protester's] freedom of speech and assembly secured to him by the First Amendment."

108.    In 1980, the City of Baton Rouge and other municipal defendants were placed under a federal consent decree intended to remedy racially discriminatory hiring practices of a class of Louisiana police and fire departments, including the BRPD. Over the years, nearly every municipal

defendant reached compliance with the consent decree and was dismissed from the case – but not the City of Baton Rouge. It took 39 years for the City of Baton Rouge to achieve "substantial compliance" with the consent decree.[14]

109.    In 2011, then-BRPD Chief Dewayne White publicly stated that ten percent of the department's officers failed to exercise basic levels of professionalism, and that "it's become so ingrained" in the minds of some officers that they "believe that everybody they come across or most people they come across with that color of skin is probably a criminal." Not long after, White was fired.

110.    In September 2014, a series of racist text messages sent by a BRPD officer to a civilian were published.  In the messages, the officer, a fifteen-year veteran of the department, referred both to Black colleagues and civilians with racial epithets, and stated, *inter alia*, "I wish someone would pull a Ferguson on them and take them out. I hate looking at those African monkeys at work . . . I enjoy arresting those thugs with their saggy pants." Another officer texted his colleagues a picture of a chimpanzee and the phrase "chimp out" in the context of the Alton Sterling protests.[15]

111.    In July 2016, after the police killing of Black Baton Rouge citizen Alton Sterling, BRPD made hundreds of arrests - including numerous peaceful Black protesters and many journalists. Through litigation it was revealed that BRPD fabricated false affidavits of probable cause the day *before* the bulk of the arrests, leading multiple officers to plead the Fifth rather than answer questions about fabricating false evidence and committing perjury. It was discovered that

---

[14] *U.S. v. City of Alexandria, et al.*, 77-cv-02040-LMA, R. Doc. 207 (E.D. La. June 3, 2019) ("Baton Rouge utilizes lawful selection processes for the hiring and promotion of police officers and firefighters; thus, the Decree can be dissolved as to this defendant.")

[15] Jim Mustian, *Baton Rouge Officer suspended after alleged racial message about Alton Sterling protests*, The Advocate, May 22, 2017.

the white chief of police had ordered every single internal affairs investigator to stay at the office, rather than witness the police handling of the protest.

112.     Suppression of Black public participation extended to the chamber of the Metro Council itself. At a series of 2017 Metro Council meetings, the white head of the Metro Council, Scott Wilson, ordered Baton Rouge police officers to remove Black speakers as soon as they said the word "Alton Sterling" or criticized the police during public comment.



*Wilson ordering police officers to remove Black residents during public comment period.*

113.     On May 10, 2017, Wilson ordered Michael McClanahan, Gary Chambers, Eugene Collins, and Sydney Epps removed. On June 28, 2017, he ordered Arthur Reed removed.



*Police officers removing Gary Chambers for making public comment.*

114.    Scott Wilson ordered police officers to "take [McClanahan] out" less than <u>one second</u> after Mr. McClanahan said the words "Alton Sterling."



*Police officers removing Michael McClanahan*

115.    Scott Wilson ordered police officers to "take [Collins] out" only <u>2.5 seconds</u> after Eugene Collins reached the podium.

25

116.    Wilson ordered both white and Black people removed, but within that group, it also appears that he discriminated on the basis of race. Five Black people (McClanahan, Chambers, Collins, Epps, and Reed) who mentioned Alton Sterling or criticized the police were removed almost immediately. White people were allowed, however, to speak significantly longer than the others. In fact, Scott Wilson only ordered one white person (Coby Weaver) removed after she pointed out the racial disparity.

**Factor 2: The Extent of Racial Polarization**

117.    As described above regarding the *Gingles* preconditions, Baton Rouge's elections evince stark patterns of racial polarization.

118.    Another method of reviewing racial polarization is homogeneous precinct (HP) analysis. It involves comparing the percentage of votes received by each of the candidates in precincts that are racially or ethnically homogeneous. The general practice is to label a precinct as homogeneous if at least 90 percent of the voters or voting age population is composed of a single race. (In Louisiana, where turnout data by race is available, a homogenous precinct is defined as a precinct in which 90 percent or more of the voters were Black or White.)

119.    In East Baton Rouge, 98 of the parish's 328 precincts are racially homogenous.

120.    A review of election data shows a clear correlation between racial make-up of the precinct and vote-share of white or Black preferred candidates.

121.    This reflects a continuity with the region's Jim Crow history. For example, Ku Klux Klan leader and Louisiana office-holder David Duke described a modern candidate as "getting the same kinds of votes that I have gotten in Louisiana. He's getting the same kinds of votes that [Pat] Buchanan got. He's getting the same votes as George Wallace."

122.    The threat of white violence against Black voters remains an issue in Baton Rouge elections. For instance, on Election Day in 2020, police were called to a polling location in East

Baton Rouge to respond to a white man standing near the polling site with an AR-15 assault rifle along with Donald Trump and Blue Lives Matter flags in an apparent attempt to intimidate Black voters. The police allowed the man to stay until he left on his own volition.

**Factor 5: Effects of Louisiana's History of Discrimination**

123.   Baton Rouge's history of discrimination has not been limited to the obstacles it has deliberately placed in the way of Black citizens attempting to exercise their right to vote.  As in many other southern cities, Baton Rouge enacted "Black Codes" and Jim Crow laws starting in the late nineteenth century.  These laws enforced a regime of state-sanctioned segregation in nearly every sphere of life including transportation, housing, education, business ownership, contracting, criminal justice, and public accommodations.

124.   Today, Black people in Baton Rouge still bear the effects of its long history of racial discrimination.  These disadvantages continue to hinder their ability to participate effectively in the political process.   "The courts have recognized that disproportionate educational[,] employment, income level[,] and living conditions arising from past discrimination tend to depress minority political participation." *St. Bernard Citizens For Better Gov't* v. *St. Bernard Par. Sch. Bd.*, 2002 WL 2022589 (E.D. La. Aug. 26, 2002) (quoting 1982 Senate Report at 29 n. 114).

125.   Black residents of Baton Rouge badly trail white residents across multiple economic metrics. Unemployment data from early 2021 shows that Black people were unemployed at more than twice the rate of whites—12% compared to 5.3%.  As of 2010, white citizens in Baton Rouge were also more than three times more likely than Black citizens to own a home.

126.   Severe racial discrimination in employment also persists.  According to the U.S. Equal Employment Opportunity Commission, for the 2011 fiscal year, Baton Rouge accounted for 3% of all U.S. race-based employment discrimination charges filed in the United States and 6.1%

of all charges of discrimination based on color, even though according to the 2010 U.S. Census, Baton Rouge comprises only 1.5% of the U.S. population and 1.6% of the U.S. minority population.

127.    Health disparities also persist among Black as compared to white Louisianans. According to the Louisiana Department of Health and Hospitals, "…death rate from all causes, approximately 1-2 times higher than White residents."

128.    There is a direct line from the racial segregation of schools to voter participation. In Louisiana, voter turnout increases with educational attainment across racial groups, but Black Louisianas have lower educational attainment levels due to de facto school segregation.

129.    The incarceration rate in Baton Rouge, as elsewhere, has expanded greatly over the last few decades.  Since 1970, the total jail population in Baton Rouge has increased 665%.

130.    Black Baton Rouge residents are subject to punishingly disproportionate policing - even worse than across the state as a whole.

131.    Both BRPD and EBRSO arrest Black residents at rates far higher than their share of population would suggest. In one dataset, 71% of arrests made by EBRSO were of Black people, even though Black people make up only 47% of that area. 75% of arrests made by BRPD were of Black people, even though Black people make up only 54% of that area.[16]

132.    One study compared a Black neighborhood and a



East Baton Rouge Parish Sheriff's Office



Baton Rouge Police Department

---

[16] https://www.vera.org/louisiana-locked-up/parish/East%20Baton%20Rouge

white neighborhood only a few miles away. The majority (96%) Black neighborhood of Fairfields has the highest imprisonment rate in the parish with almost 2% of the neighborhood locked up: 1,773 per 100,000 residents. In contrast, in the majority (70%) white Jefferson/Drusilla neighborhood to the southeast, the imprisonment rate is more than 49 times lower: 35 people imprisoned per 100,000 neighborhood residents. [17]



133.    For example, in 2016, Black people were 2.9 times as likely as white people to be arrested for marijuana possession in Louisiana, despite evidence that black people and white people use marijuana at similar rates.[18]

134.    But in Baton Rouge, a Black person was 6 times as likely as a white person to be arrested by the Baton Rouge Police Department (BRPD) for marijuana possession in 2016.[19]

135.    And a Black person was 3.9 times as likely as a white person to be arrested by the

---

[17] https://www.prisonpolicy.org/origin/la/2022/report.html

[18] https://www.splcenter.org/20180918/racial-profiling-louisiana-unconstitutional-and-counterproductive

[19] *Id.*

East Baton Rouge Parish Sheriff's Office for marijuana possession in 2016.[20]

136.    One study looked at Baton Rouge Police Department traffic stops for "loud music."

The traffic stops were then placed on a map:



137.    The distribution of "loud music" traffic stops almost perfectly maps onto

the distribution of Black people in Baton Rouge:[21]

---

[20] *Id.*

[21] *Id.*



138.    If one zooms in, it becomes apparent that the "loud music" stops almost entirely

disappear south of Florida Avenue - the "unofficial dividing line"[22] between Black and white

Baton Rouge:[23]

---

[22] https://www.npr.org/2016/07/14/485875467/in-baton-rouge-simmering-mistrust-divides-police-community

[23] https://www.splcenter.org/20180918/racial-profiling-louisiana-unconstitutional-and-counterproductive



139.    According to the study's authors, the "maps suggest that enforcement of the music ordinance is much more closely associated with the presence of African Americans in a tract's population than with overall population density."[24]

140.    This was corroborated by another data analysis, which showed that Black people were 6.8x more likely to be arrested for low level, non-violent offenses than a white person.[25]



---

[24] *Id.*

[25] https://policescorecard.org/la/police-department/baton-rouge

141.    Another data analysis showed that while the area of BRPD's jurisdiction is about half Black, <u>100% of the people killed by BRPD were Black</u>:[26]



Source: *Uniform Crime Report*, *Mapping Police Violence*, *LEMAS*

### Factor 6: Presence of Racial Campaign Appeals

142.    Louisiana political campaigns have consistently been characterized by both overt and implicit racial appeals. The political career of long-time neo-Nazi and former Ku Klux Klan leader David Duke is sadly illustrative. In 1989, Duke was elected to the Louisiana State House of Representatives.

143.    Social scientists have observed that "there does seem to be enough evidence that in the 1995 Louisiana gubernatorial election certain candidates succumbed (to use the phrase of Kinder and Sanders [1996:198]) to 'the electoral temptations of race.'" They observed that:

> The Foster campaign made a number of issues salient which reinforced a conservative image, especially on race. He called for a repeal of affirmative action programs, supported the plaintiffs in the Hays v. Louisiana case that challenged the

---

[26] *Id.*

"majority-minority" congressional district of Cleo Fields, and challenged the Motor Voter law. Perhaps the best example of symbolic racism came during the runoff campaign, when Foster was discussing the problem of crime. He noted that predominantly white Jefferson Parish "is right next to the jungle in New Orleans and it has a very low crime rate" (quoted in Ott, 1995:2). This is precisely the sort of racial code word central to the new symbolic racism (Edsall and Edsall, 1992:Chap. 10).[27]

144.    In 2022, Republican U.S. Senator John Kennedy released his third televised ad of his re-election campaign. In it, Senator Kennedy said "if you hate cops just because they're cops, the next time you're in trouble, call a crackhead." Kennedy was described by at least one commentator as a "walking dog whistle."

145.    In 2023, gubernatorial candidate Jeff Landry ran an advertisement that said "your criminal justice system is broken" and showed images of *only* Black district attorneys, alongside videos of young Black men engaged in shootouts.

146.    In 2023, the influential Freedom Caucus PAC sent a text message to potential voters soliciting $55 donations to the group in exchange for signed copies of a book entitled "Racism Revenge and Ruin: It's All Obama."

147.    In 2024, advocates of the formation of a new EBR city of St. George noted that separation was necessary because "years of bussing following the Brown ruling had destroyed the sense of community."

**Factor 7: Extent to Which Black Louisianans Have Been Elected to Public Office**

148.    Despite constituting almost half of the city's population, Black people in Baton Rouge remain chronically underrepresented in public office in the state.

149.    Despite white citizens comprising less than half of the Parish, the Parish is represented by a white associate justice of the Louisiana Supreme Court, 75% white judges on the

---

[27] Knuckey, J., & Orey, B. D. (2000). Symbolic Racism in the 1995 Louisiana Gubernatorial Election. Social Science Quarterly, 81(4): 1027-1035. Available online at https://core.ac.uk/download/pdf/188051192.pdf

Court of Appeal, 75% white family court judges, 83% white justices of the peace, 83% white constables, 60% white state senators, 53% white state representatives, a white Sheriff, a white District Attorney, a white City Attorney, a white Clerk of Court, a white Assessor, a white Coroner, and 50% white mayors (Zachary, Central, Baker, and the Mayor-President).

150.    Within East Baton Rouge Parish is the City of Central, which has an <u>all</u> white city council.

151.    Within East Baton Rouge Parish is the City of Zachary, which also has an <u>all</u> white city council.

152.    Only three of the current 11 members of the Louisiana Board of Elementary and Secondary Education are people of color. Under the previous administration, that number was two out of 11 members (18%).

153.    This is mirrored by state-wide offices. Louisiana has not elected a Black person to state-wide office since the 1800's.

154.    Black judges too have been "underrepresented in the trial and appellate courts. While the black population comprises about 30.5 percent of the voting age population in Louisiana, black people only account for about 17.5 percent of the judges in Louisiana." *Terrebonne Par. Branch NAACP*, 274 F. Supp. 3d at 445.

**<u>Factor 8: Lack of Responsiveness to the Particularized Needs of Black Voters</u>**

155.    The lack of representation of Black people in Baton Rouge in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black community.

156.    As discussed above, Black Louisianans suffer from the effects of discrimination across many areas, including education, employment, and health.  In each of these areas, the

continued existence of severe racial disparities is indicative of a failure on the part of elected officials to address the needs of Black residents.

157.    For example, a 2009 study on the occupants of top-level city administrative positions in East Baton Rouge Parish found that white employees in the parish are disproportionately appointed, hired, and maintained in the highest paying jobs.

158.    The lack of responsiveness to the needs of Black voters has been thrown into sharp relief by the devastating effects that the COVID-19 pandemic has wrought upon the state. Black residents have the highest rates of COVID-19 cases and deaths in Baton Rouge. Although only one-half of the city's population, Black people in Baton Rouge accounted for more than 70% of the people who died of COVID-19 in Baton Rouge.

159.    Racial disparities have also been observed in the distribution of COVID-19 vaccines across the state. Compared with white neighborhoods, parts of the state with high concentrations of Black residents (such as North Baton Rouge) have suffered from fewer vaccination sites.

160.    North Baton Rouge has been described as a "food desert."

161.    In Baton Rouge, police are about half as likely to solve the murder of a Black person as the murder of a white person:

**PERCENT OF HOMICIDES UNSOLVED BY RACE**

Homicides of Black Victims Unsolved ( 45% )

Homicides of Latinx Victims Unsolved ( 7% )

Homicides of White Victims Unsolved ( 24% )

*Source: MAP/Supplementary Homicide Report*

## Factor 9: Tenuousness of Justifications for Restricting Black Voters to One Majority-Black District

162.    Throughout the redistricting process, opponents of a sixth majority-Black district on the council provided shifting and tenuous justifications for their opposition. Each of the purported justifications were refuted extensively throughout the process.  After justifications were refuted, opponents of a sixth majority-Black district often shifted to other, new justifications for their opposition.

163.    District 11 Council member Laurie Adams, who voted for the illegal map, said that splitting certain neighborhoods would break up communities with common interests and make it more difficult for them to advocate for themselves. "These are neighborhoods and areas that are deeply committed to having our parish be the strongest that it can be," Adams said.

164.    White Councilman Rowdy Gaudet said that "I recognize things will be changed; I've looked at the population numbers and (my district) saw a tremendous increase and become more diverse." But then he voted for the illegal map that reinforced the status quo and further entrenched white control of the Council.

165.    Notably, the maps produced by the Parish did not even describe white and Black voters in the same way. Map 4B, approved by the Council, measured white and Black residents

using different criteria:

| White | Black |
|---|---|
| White | NH_DOJ_Blk |
| % White | %NH_DOJ_Blk |
| 18+_Wht | 18+DOJ_Blk |
| %18+_Wht | %18+DOJ_Blk |
| RVWhite | RVBlack |
| %RVWhite | %RVBlack |

166.    White residents are counted by people who identify as white. But Black residents

are counted by "NH_DOJ_Blk" (or "non-hispanic DOJ Black") which "combines all single-race

Black identifiers who are also non-Hispanic with everyone who is non-Hispanic and identifies as

white and Black." [28]

167.    Thus, the Council explicitly excluded residents who identify as Black *and* Hispanic

from their counting.

168.    Notably, the United States Supreme Court, the Fifth Circuit, and the Middle District

of Louisiana have all held that NH_DOJ_Blk is the wrong way to count Black voters in a voting

rights case, and that instead parties should use "Any Part Black."[29]

---

[28] *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 796 (M.D. La. 2022).

[29] *Georgia v. Ashcroft,* 539 US 461 (2003) ("Georgia and the United States have submitted slightly different figures regarding the black voting age population of each district. The differing figures depend upon whether the total number of blacks includes those people who self-identify as both black and a member of another minority group, such as Hispanic. . . . Here, however, the case involves an examination of only one minority group's effective exercise of the electoral franchise. In such circumstances, we believe it is proper to look at *all* individuals who identify themselves as black."); *Robinson v. Ardoin*, 22-30333 (5th Cir. 2022) ("The district court adopted the 'Any Part Black' metric. . . . As the district court noted, the Supreme Court has confronted this question before. It explained that the DOJ Black metric 'may have more relevance if the case involves a comparison of different minority groups.' But where "the case involves an examination of only one minority group's" voting strength, the Court considered it 'proper to look at all individuals who identify themselves as black.' We have no reason to part from that holding. This case, like *Georgia v. Ashcroft*, presents no need for comparing minority groups.") (citations omitted).

169.    The Council was specifically advised that using "Any Part Black" would [what] "the percentage that group has in relation to the overall population total."

170.    Specifically, in an undated memorandum, Hefner wrote to the Council that:

The first method is to allocate any census respondent who self-identified as White and a minority race to that minority race. This is the aggregation we traditional[*sic*] use for redistricting which can include Black as a single or any other race (Any Part Black). It could also be just Black and White. Either category is permissible to use but the larger number associated with the Any Part Black increases the population and therefore the percentage that group has in relation to the overall population total. Which category we use is at the Council's discretion.

171.    Hefner explained that the alternative method (NH_DOJ_Blk) is usually "used in court cases involving multiple minority race responses that are germane to the court case."

172.    Initially, Hefner used the Any Part Black method.

173.    On information and belief, the Council overrode Hefner and chose not to use the Any Part Black counting method, and instead chose to use the NH_DOJ_Blk method.

## CAUSE OF ACTION

### Count One

### Ordinance 18596 Violates Section 2 of the Voting Rights Act of 1965
### 52 U.S.C. § 10301; 42 U.S.C. § 1983
### (Vote Dilution)

174.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

175.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group.  52 U.S.C. § 10301(a).

176.    The current district boundaries of the Baton Rouge Metro Council Louisiana's 2025 map, as established in Ordinance 18596, results in the dilution of the electoral strength of those

voters in violation of Section 2 of the Voting Rights Act.

177.    Black citizens of Baton Rouge are sufficiently numerous and geographically compact to constitute a majority of eligible voters in six Metro Council districts. Black voters in Baton Rouge are politically cohesive, and recent elections reveal a stark pattern of racially polarized voting that nearly always results in the defeat of Black voters' preferred candidates in elections and in districts in which the majority of voters are white.

178.    Moreover, considering the totality of the circumstances in Baton Rouge, Plaintiffs have less opportunity than other members of the Parish to participate in the political process and to elect representatives of their choice to Congress.

179.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

180.    Plaintiffs will be irreparably harmed if this Court fails to temporarily and permanently enjoin Defendants from conducting elections under the enacted plan, in that, among other things, they would be subject to racial vote dilution. Plaintiffs have no adequate remedy at law.

### Count Two

### Ordinance 18596 Violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution (via 42 U.S.C. s. 1983)

181.    The above paragraphs are hereby incorporated by reference as if set forth fully herein.

182.    The Fifteenth Amendment states: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. The Fifteenth Amendment "right to

vote" may "be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *LULAC v. Edwards Aquifer Auth.*, 937 F.3d 457, 462 (5th Cir. 2019) (*quoting Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

183.    The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The Equal Protection Clause requires States to draw legislative districts so that citizens' votes are counted equally. *Baker v. Carr*, 369 U.S. 186 (1962). Thus, the Clause prohibits a State from gerrymandering in such a way that the State dilutes the votes of one class of voters and thereby treats voters unequally under its laws. *Shaw I*, 509 U.S. at 640-41.

184.    Here, the white voting age population of East Baton Rouge Parish has declined such that they are no longer the majority of the voters in the Parish.

185.    But the white Metro Council has passed a map that would place nearly 60% of the Metro Council seats in white-majority districts.

186.    This new map creates an even stronger entrenchment of white control of the council than before; whereas before there were six majority-white district and one plurality-white, there are now seven majority-white districts.

187.    Defendants approved this map so as to dilute the votes of Black voters and thereby treat voters unequally under its laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Declare that the 2025 Metro Council map violates Section 2 of the Voting Rights Act and the United States Constitution;

B.    Issue a preliminary and permanent injunction enjoining Defendants from enforcing or giving any effect to the boundaries of the 2025 Metro Council map as adopted by the Metro

Council in 2022, including barring Defendant from conducting elections in accordance with that plan;

       C.      Order the adoption of a valid Metro Council redistricting plan for Baton Rouge that includes six districts in which Black voters have an opportunity to elect candidates of their choice;

       D.      Award Plaintiffs' their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bring this pursuant to in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. 1988;

       E. Retain jurisdiction over this matter until the Defendant has complied with all orders and mandates of this Court; and

       F. Grant such additional further relief as the Court considers just.

Respectfully submitted,

*/s/ William Most*
William Most (La. Bar. No. 36914)

*/s/ David Lanser*
David Lanser (La. Bar. No. 37764)
Hope Phelps (La. Bar. No. 37259)
MOST & ASSOCIATES
201 St. Charles Ave.
Ste. 2500, #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
Fax: (504) 414-6400
williammost@gmail.com
hopeaphelps@outlook.com
david.lanser@gmail.com