# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CLEVE DUNN, JR., ET AL.** | **CIVIL ACTION NO. 3:24-CV-00521** |
| **VERSUS** | **CHIEF JUDGE DICK** |
| **EAST BATON ROUGE PARISH, CITY OF BATON ROUGE, ET AL.** | **MAGISTRATE JUDGE WILDER-DOOMES** |

### EAST BATON ROUGE PARISH/CITY OF BATON ROUGE'S MEMORANDUM REGARDING THE IMPACT OF LOUISIANA V. CALLAIS

**NOW INTO COURT**, through undersigned counsel, comes Defendant, City of Baton Rouge, Parish of East Baton Rouge, *through the Baton Rouge Metropolitan Council* ("Metro Council" or "Council"), who respectfully files this Memorandum Regarding the Impact of *Louisiana v. Callais* in compliance with this Court's August 21, 2025 Order (R. Doc. No. 32).

In *Callais,* the United States Supreme Court held that compliance with Section 2 of the Voting Rights Act of 1965 ("VRA" or "Section 2") is a compelling government interest sufficient to satisfy strict scrutiny applied to the State's intentional use of race as criteria in drawing voting district lines.[1] However, in so holding, the Court also limited the instances in which Section 2 would require such a use of race for compliance. Specifically, the Court held that Section 2 "imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race."[2] To effect this change, the Court "updated" and "realigned" the manner in which courts analyze claims under Section 2.

The updated and realigned analysis for Section 2 claims places a nigh-insurmountable burden on Plaintiffs in the instant matter, highlighting and emphasizing some of the flaws and deficiencies

---

[1] *Louisiana v. Callais*, 146 S. Ct. 1131, 1143 (2026).
[2] *Id.*, at 1157.

1

noted in the Metro Council's pending Motion to Dismiss, R. Doc. No. 18. Specifically, the Metro Council maintains that because the Complaint was facially deficient because (1) Plaintiffs failed to allege facts sufficient to state a claim to relief that is plausible on its face because the allegations do not render it plausible that Plaintiffs could satisfy the *Gingles* preconditions; and (2) Plaintiffs have failed to allege a concrete and particularized injury-in-fact capable of being redressed by a favorable decision of this Court and therefore lack standing to invoke this Court's jurisdiction. In light of *Callais*, these deficiencies are even more egregious.

## I.    Post-*Callais* Analysis of Section 2

As the Court is aware, to prevail on a vote dilution claim under Section 2 of the VRA, plaintiffs must first satisfy three threshold conditions set forth by the United States Supreme Court in *Thornburg v. Gingles*.[3] That is, a Section 2 plaintiff must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) the "White majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."[4] Once those preconditions are met, the plaintiff must demonstrate that, under the "totality of the circumstances," the challenged districting map violates Section 2.[5] This overarching *Gingles* framework remains unchanged after the Supreme Court's decision in *Louisiana v. Callais*; however, the *Callais* Court updated the analysis employed in establishing each factor to realign the focus of Section 2 as an enforcement mechanism for the Fifteenth Amendment's prohibition on intentional racial discrimination.[6]

---

[3] *Thornburg v. Gingles*, 478 U.S. 30 (1986).
[4] *Id.* at 50-51.
[5] *Allen v. Milligan*, 599 U.S. 1, 18 (2023).
[6] *Callais*, 146 S. Ct. at 1155-56.

### A. *Gingles* Precondition 1: A Sufficiently Large and Geographically Compact Minority Group

The inquiry into the first *Gingles* precondition is not based solely on whether there is an overall majority of minority voters, but whether there is a large enough group of minority voters that reside close enough together to create an additional minority-majority district without violating other legal considerations. So, Section 2 plaintiffs must prove not only numerosity, but compactness. Section 2 plaintiffs typically submit illustrative maps showing their desired number of majority-minority districts to satisfy this first precondition.

However, the *Callais* Court noted that such maps "prove only that the State *could* create an additional majority-minority district, not that the State's failure to do so violated [Section 2]."[7] To address this issue, the *Callais* Court ruled that illustrative maps submitted by a Section 2 plaintiff must satisfy two conditions: (1) the illustrative map cannot use race as a districting criterion; and (2) the illustrative map must satisfy all of the State's constitutionally permissible criteria, objectives and goals.[8]

By satisfying both conditions, plaintiffs' illustrative map disentangles race from politics, and may demonstrate that not only could the districting body have created an additional majority-minority district, but the districting body's failure to do so was not simply the unintended effect resulting from the pursuit of constitutionally permissible aims.

### B. *Gingles* Preconditions 2 and 3: Racially Polarized Voting

The second and third *Gingles* preconditions pose the same question, but for different demographic groups: Does the minority/majority group vote as a bloc?[9] To satisfy this precondition, plaintiffs must prove that "a significant number of minority group members usually

---

[7] *Id.* at. 1159.
[8] *Id.*
[9] *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020) (citation omitted).

3

vote for the same candidates" and that "the White majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."[10] While this criteria remains unchanged, the *Callais* Court ruled that the Section 2 plaintiff's analysis must control for partisan affiliation.[11] "In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation."[12]

The Court reasoned that, "[f]ailing to account for political considerations in redistricting . . . can allow plaintiffs to undo a State's legitimate, nonracial decisions under the banner of § 2."[13] Since we have a two-party system (and political gerrymandering is constitutionally permissible), an analysis which does not control for party affiliation may be just as likely to show the challenged map was the result of political gerrymandering, rather than racial gerrymandering.[14] The Court's reasoning is similar to that of the Metro Council in its analysis of Plaintiffs' allegations in its pending Motion to Dismiss — without controlling for party affiliation, a showing that a group of individuals usually votes for the same candidate could just as easily be explained by their party affiliation as it could their race.[15]

### C. Totality of the Circumstances

Finally, if the Section 2 plaintiff has fulfilled each of the *Gingles* preconditions, the court is to consider whether, under the "totality of circumstances," members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[16] In making this determination, courts have traditionally relied on nine (9) non-exclusive factors outlined in a Senate Report which accompanied a 1982 amendment

---

[10] *Gingles*, 478 U.S. at 50-51.
[11] *Callais*, 146 S. Ct. at 1159.
[12] *Id.*
[13] *Id.* at 1161.
[14] *Id.* at 1158-1159.
[15] *See* R. Doc. No. 18-1, pp. 17-21.
[16] 52 U.S.C. 10301(b).

4

PD.61743971.2

to the VRA which range from the history of official voting-related discrimination in the jurisdiction to whether racial appeals are used in political campaigns.[17]

However, the *Callais* Court changed this analysis to "focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting."[18] Thus, courts are still called to conduct an inquiry into the "totality of circumstances," yet "discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight."[19] Rather than relying on the nine "Senate Factors," the *Callais* Court instructed courts to consider facts which are "far more germane" to the issue of current intentional discrimination, such as current data and current political conditions to determine whether, on the basis of race, a political process affords members of a racial group with less opportunity than other members of the electorate to elect representatives of their choice.[20]

## II.    Impact of *Callais* on Instant Matter

Since the decision in *Callais* alters the analysis applicable to Section 2 vote dilution cases, its holding directly impacts the present case, including the Metro Council's pending Motion to Dismiss, R. Doc. No. 18.

In its Motion to Dismiss, the Metro Council argues that Plaintiffs do not have standing under Article III of the United States Constitution because they failed to allege well-pleaded facts which render it plausible, not merely conceivable, that the Plaintiffs have suffered a non-hypothetical and particularized injury-in-fact which is likely to be redressed by a favorable decision of this Court.

---

[17] *Gingles*, 478 U.S. at 37.
[18] *Callais*, 146 S. Ct. at 1159.
[19] *Id.* at 1160 (citation omitted).
[20] 52 U.S.C. 10301(b).

PD.61743971.2

In other words, Plaintiffs failed to allege facts which render it plausible that Plaintiffs could satisfy the *Gingles* preconditions.[21]

The Metro Council reasoned that without alleging well-pleaded facts which render the existence of a sufficiently large, geographically compact, and politically cohesive minority population plausible (*i.e.* satisfaction of the first and second *Gingles* precondition), the possibility that this Court could order the creation of a hypothetical and legally valid, sixth majority-minority district to encompass such a population is merely conceivable, not plausible.[22] Likewise, it reasoned that without alleging well-pleaded facts which render it plausible that a politically cohesive White majority usually votes to defeat the preferred candidate of the above-described population (*i.e.* satisfaction of the third *Gingles* precondition), the possibility that this hypothetical, large, geographically compact, and politically cohesive minority population was harmed is merely conceivable, not plausible.[23]

The Metro Council argued that the facts alleged in the Complaint struggle to shift the possibility that a favorable decisions from this Court could result in the creation of a legally valid sixth Black-majority district in the realm of the conceivable, much less that of the plausible. Now, the *Callais* decision makes it even less plausible that Plaintiffs could satisfy the *Gingles* factors.

### A. *Gingles* Precondition 1: A Sufficiently Large and Geographically Compact Minority Group

As extensively discussed in the Memoranda filed by the Metro Council in support of its Motion to dismiss,[24] the Complaint does not allege facts to render it plausible that a large and geographically compact minority group sufficient to create an additional majority-minority district

---

[21] *See Growe v. Emison*, 507 U.S. 25, 40-41 (1993) ("Unless [the *Gingles* factors] are established, there neither has been a wrong nor can be a remedy.").
[22] *Id.* at 40.
[23] R. Doc. No. 25, p. 3.
[24] R. Doc. Nos. 18-1 and 25.

exists. Pertinent here, Plaintiffs point to Plan 7A as an illustrative map to establish plausibility. However, as pointed out previously, Plan 7A violates traditional districting principles by separating communities of interest to achieve the goal of creating a sixth majority-Black district. In other words, Plan 7A directly violates both of the conditions imposed by the *Callais* Court in satisfying the first *Gingles* precondition because it uses race as a districting criterion and fails to satisfy all of the Metro Council's constitutionally permissible criteria, objectives and goals.

By Plaintiffs' own admission, in its redistricting, the Metro Council did not want to "break up communities with common interests and make it more difficult for them to advocate for themselves."[25] Yet, Plan 7A would split the entire town of Baker between districts and pair together dissimilar communities. Moreover, the district lines in Plan 7, the plan from which Plan 7A was derived, were drawn "based solely on race and how it would affect the targeted Black percentages for District 1."[26] As such, Plaintiffs have only offered facts which show that the creation of a sixth Black-majority district would require the Metro Council (or this Court) to violate Section 2 and the Equal Protection Clause by considering race as the predominant factor in redistricting. Further Plaintiffs' illustrative map fails to satisfy all of the Metro Council's constitutionally permissible districting criteria. Therefore, on its face, the Complaint fails to allege facts which satisfy the first updated *Gingles* precondition under *Callais*.

### B. *Gingles* Preconditions 2 and 3: Racially Polarized Voting

As also discussed in the Memoranda filed by the Metro Council, Plaintiffs allegations do not actually support a reasonable inference that there exists a politically cohesive White majority that usually thwarts the election of candidates preferred by a politically cohesive Black population. Instead, the Complaint ties together loose correlations using incomplete statistics and faulty logic

---

[25] R. Doc. No. 1, ¶ 163.
[26] R. Doc. No. 18-1, pp. 3-4.

7

which may make Plaintiffs' claims conceivable, but not plausible. In fact, in attempting to satisfy the second and third *Gingles* precondition, Plaintiffs solely rely upon statistics showing (1) candidate-voter racial congruence — which is irrelevant to this issue[27]; and (2) partisan affiliation — the very thing prohibited from consideration by the *Callais* Court.[28]

As the Metro Council stated in the Motion to Dismiss, "a correlation between the percentage of the population that is Black/White and the percentage of the population that supports a particular candidate does not mean that the population identifying as each demographic votes cohesively."[29] Likewise, Plaintiffs' alleged statistics fail to control for partisan affiliation, but rather rely upon it. Because Plaintiffs fail to disentangle race from politics, their allegations render it equally likely that the alleged political cohesion is a result of party affiliation as it does, race. Therefore, on its face, the Complaint fails to allege facts which satisfy the second and third updated *Gingles* precondition under *Callais*, rendering it conceivable that there exists a politically cohesive Black population whose preferred candidates are usually defeated by a politically cohesive White majority — not plausible.

### C. Totality of the Circumstances

Although not germane to the pending Motion to Dismiss, the *Callais* decision also affects how the Court must view Plaintiffs' allegations as to whether the "totality of circumstances," demonstrates that members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice as a result of their race.[30]

---

[27] *Gingles*, 478 U.S. at 68.
[28] *Callais*, 146 S. Ct. at 1159.
[29] R. Doc. No. 18-1, p. 18.
[30] 52 U.S.C. 10301(b).

8

Plaintiffs devote nearly one-hundred paragraphs of their Complaint in an attempt to show that the totality of circumstances weigh in favor of finding that the Metro Council's adoption of Ordinance 18596 violated Section 2.[31] Nearly all of these allegations are of historical discrimination, present-day disparities that are characterized as the ongoing effects of societal discrimination, and other facts that are irrelevant to the issue.

As the *Callais* Court pointed out, "the 'totality of circumstances' inquiry must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting."[32] However, out of the nearly one-hundred paragraphs of allegations devoted to this issue, Plaintiffs only allege one single circumstance that relates to present-day intentional racial discrimination regarding voting, and that relation is tenuous at best.[33] A single instance of unproven racial discrimination from a private citizen at a polling place cannot serve to support an inference that the "totality of circumstances" demonstrates the Metro Council's redistricting plan violates Section 2.

## III.  Conclusion

In *Louisiana v. Callais*, the United States Supreme Court expressly stated that a violation of Section 2 of the Voting Rights Act does not require a finding of discriminatory intent; however, it held that Section 2 "imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred."[34] In so holding, the Court altered the way in which courts practically analyze Section 2 claims.

Under the revised analytical framework, Plaintiffs are not required to prove that the Metro Council adopted Ordinance 18596 with discriminatory intent, but Plaintiffs must account for all

---

[31] R. Doc. No. 1, ¶¶ 83-173.
[32] *Callais*, 146 S. Ct. at 1159.
[33] R. Doc. No. 1, ¶ 122.
[34] *Callais*, 146 S. Ct. at 1156.

9

other possible motives for adopting Ordinance 18596. And then further, the Court limited the ways in which Plaintiffs could make a showing of discriminatory intent. As such, it is nigh-impossible that Plaintiffs could ever prevail on their asserted claims.

Respectfully submitted,

**PHELPS DUNBAR LLP**


BY:    /s/ Christopher J. Vidrine
Walt Green (La. Bar Roll No. 27812)
Christopher J. Vidrine (La. Bar Roll No. 40538)
II City Plaza | 400 Convention Street, Suite 1100
Baton Rouge, Louisiana 70802
Telephone: 225 376 0292
Facsimile: 225 381 9197
Email: walt.green@phelps.com
Email: chris.vidrine@phelps.com


ATTORNEYS FOR DEFENDANT, CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, THROUGH THE BATON ROUGE METROPOLITAN COUNCIL


## CERTIFICATE OF SERVICE

I hereby certify on May 27, 2026, the foregoing *Memorandum Regarding the Impact of Louisiana v. Callais* was electronically filed with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


    /s/ Christopher J. Vidrine.
    Christopher J. Vidrine


10

PD.61743971.2