**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

CLEVE DUNN, JR., ET AL. CIVIL ACTION

VERSUS 3:24-521-SDD-EWD

EAST BATON ROUGE PARISH ET AL.,

**RULING**

This matter is before the Court on the *Motion to Dismiss Pursuant to Rule 12 for Lack of Subject Matter Jurisdiction* and *Failure to State a Claim*[1] filed by Defendant City of Baton Rouge, East Baton Rouge Parish (the "City/Parish" or "Defendant"). Plaintiffs Chauna Banks ("Banks"), Darryl Hurst ("Hurst'), Cleve Dunn, Jr. ("Dunn"), LaMont Cole ("Cole"), Carolyn Coleman ("Coleman"), Lael Montgomery ("Montgomery"), and Eugene Collins ("Collins"), filed an *Opposition*,[2] to which Defendant filed a *Reply*.[3] After careful consideration of the parties' arguments and the applicable law, the Court finds that the Defendant's *Motion* shall be GRANTED and Plaintiffs' claims dismissed without prejudice.

## I. FACTUAL BACKGROUND

This case arises from the Baton Rouge Metropolitan Council's ("Metro Council") adoption of Ordinance No. 18596 (the "Ordinance"), approving a reapportioned map for the Metro Council Districts (the "Districts") to address, pursuant to La. R.S. 33:1411(A), substantial variations in their representation identified following the 2020 United States Census. Plaintiffs are African American members and constituents of the Metro Council

[1] Rec. Doc. No. 18.
[2] Rec. Doc. No. 20.
[3] Rec. Doc. No. 25.

that challenge the approved map ("Plan 4B") as an unlawful apportionment that "dilutes Black voting strength in violation of the Voting Rights Act of 1965 ('VRA') and the United States Constitution."[4] More specifically, Plaintiffs allege that Map 4B "pack[s] large numbers of Black voters into a few majority-Black council districts and crack[s] the remaining Black voters among the majority-white districts."[5] The following facts, relevant to the Court's consideration of the instant *Motion*, are taken from the *Complaint* and public records attached to Defendant's *Motion to Dismiss*.[6]

Louisiana law requires that within six months of each decennial census, jurisdictions that elect their members by district "examine the apportionment plan of its body to determine if there exists any substantial deviation in the representation of the election districts."[7] That is, no district may have a population that deviates greater than plus or minus five (5) percent of the "ideal district population"—a figure determined by

[4] Rec. Doc. No. 1, p.1.

[5] *Id.* at pp. 1, 4.

[6] When considering a motion to dismiss, courts are generally limited to the complaint and its proper attachments. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted). The City/Parish, however, requests that the Court take judicial notice of certain information referenced in its *Motion to Dismiss*, namely, "all [relevant] information contained on the Metro Council website," the 2020 Census data, and attached memoranda from its demographer, Mike Hefner—which was submitted to the Metro Council as part of the redistricting process. Rec. Doc. No. 18-1, p.1. Plaintiff does not oppose this request and, in fact, references much of the same information in their pleading. In any event, it is well-settled that, at the motion to dismiss stage, courts can consider matters of public record attached to, or contained within, a motion to dismiss. *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Lewkut v. Stryker Corp.*, 724 F. Supp. 2d 648, 653 (S.D. Tex. 2010) (citing *Chauhan v. Formosa Plastics Corp.*, 2000 WL 423367, at *1 (5th Cir. 2000)). Thus, "it is clearly proper in deciding a 12(b)(6) motion" to take judicial notice of such records. *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). To the extent the City/Parish's request extends to information that is properly subject to judicial notice—that is, unless otherwise noted, it comports with the requirements set forth in Federal Rule of Evidence 201(b)(2)—the Court will take notice as necessary to decide the instant *Motion*. *See Jason v. The Coca Cola Co.*, 435 F. App'x 346, 353 n.5 (5th Cir. 2011) (stating that courts may take "judicial notice of information posted on a government website"); *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice"); La. R.S. § 44:1 (A)(2)(a) (defining "public records" to include all "memoranda … having been used … or prepared … for use in the conduct … or performance of any work, duty, or function which was conducted … or performed by or under the authority of the constitution or laws of [Louisiana] [,]" such as redistricting pursuant to La. R.S. 33:1411(A)).

[7] La. R.S. § 33:1411(A).

dividing the total population of a parish by its number of districts.[8] From this examination, the jurisdictional authority must either "declare its apportionment to be equitable … or provide for a new apportionment plan."[9]

East Baton Rouge Parish ("EBRP") encompasses the cities of Baton Rouge, Baker, Zachary, and Central, and consists of twelve (12) Metro Council Districts, each with an elected seat on the Metro Council. The Metro Council is, therefore, subject to the requirements of La. R.S. § 33:1411(A). The U.S. Census Bureau delivered its apportionment counts for the 2020 Census on April 26, 2021 (the "Census").[10] Showing that EBRP's overall population had increased by 3.8% between 2010 and 2020, the Census also revealed that its black population had increased by 5%, while its white population declined by approximately 9% during that same period.[11] Following the Census, the Metro Council hired Mike Hefner ("Hefner"), a demographer with Geographic Planning & Demographic Services ("GPDS"), to determine if a reapportionment was required. At the time, East Baton Rouge Parish consisted of six (6) majority-white, one (1) plurality-white, and five (5) majority-black Districts; Plaintiffs refer to this composition as the "seven consistently-white-held" and "five consistently-Black-held" Districts.[12]

Following a review of the updated Census information, Hefner reported that eight of the twelve Districts were "outside of the allowable deviation range" and required redistricting to "rebalance the population counts" to within plus or minus five (5) percent

---

[8] Joint Rule 21, H.C.R. 90, 2021 R.S. (June 11, 2021); Rec. Doc. No. 18-2, p. 1.
[9] La. R.S. § 33:1411(A).
[10] Rec. Doc. No. 1, ¶ 37.
[11] *Id.* at ¶¶ 38-40.
[12] *Id.* at ¶ 67; *see* Metro Council website, REDISTRICTING 2022 (https://www.brla.gov/2723/Redistricting-2022) (p. 1, Summary of E. Baton Rouge Metro Council Plan Demographics for Plans 4 through 8).

"of the ideal district number," which he determined to be 38,065 persons.[13]

The Metro Council subsequently held six Redistricting Workshops between February and August 2022 "to brainstorm various configurations to the [D]istricts that would result in a plan that better represents the Parish."[14] Following the first of these workshops, Hefner submitted a memorandum to the Metro Council indicating that he "would like to dedicate the majority of the available working time to concentrate on the majority-minority districts … but [would] need to see if the census numbers and geography would work to increase the number of [such] districts."[15] Throughout the subsequent redistricting process, Hefner submitted seventeen apportionment plans (i.e., illustrative maps) for the Metro Council's consideration.[16] Of these, Plans 4, 4B, and 8 retained the current seven (7) consistently-white-held District configuration, converting District No. 8, the previously plurality-white district, into a new majority-white one.[17] Plans 5B, 7, and 7A, however, created a sixth majority-black district.[18] Plans 5, 5A, 6 and 6A presented the option of apportioning six (6) majority-white and five (5) majority-black districts alongside a "toss-up district"—a configuration which Hefner suggested "may be a plan that has a fair representation of the Black population in the Parish."[19]

On August 10, 2022, the Metro Council took up the Ordinance, entitled "Approving a Reapportionment Plan for the Metropolitan Council in Accordance with Section 2.01 of the Plan of Government, Said Plan to Become Effective January 1, 2025."[20] The Metro

---

[13] Rec. Doc. No. 18-2, pp. 1-2.
[14] Rec. Doc. No. 18-3, p. 1.
[15] Rec. Doc. No. 18-4, p. 5.
[16] *See* Metro Council website, REDISTRICTING 2022 (https://www.brla.gov/2723/Redistricting-2022).
[17] Rec. Doc. No. 1 ¶ 46.
[18] *See supra* note 16 (Plans 5, 7, and 7A); Rec. Doc. No. 1, ¶ 58.
[19] Rec. Doc. No. 1, ¶ 48; Rec. Doc. No.18-7, p.1.
[20] *Id.* at ¶ 49.

Council's seven white members voted to adopt Plan 4B. A substitute motion to adopt Plan 7A and, thus, create a sixth majority-black district was rejected by same.[21]

On June 26, 2024, Plaintiffs initiated this lawsuit alleging the Ordinance dilutes the electoral strength of black voters in violation § 2 of the VRA and runs afoul the Fourteenth and Fifteenth Amendments to the U.S. Constitution.[22] Although Plan 4B maintains the pre-existing composition of seven (7) white-held and five (5) black-held Districts, Plaintiffs challenge that the Council rejected "multiple [proposed] maps … that contain[ed] six majority black districts,"[23] and, instead, adopted the plan that would "*increase* the entrenchment of white control of the Council by turning a plurality-white district into a new majority-white" one.[24] In doing so, Plaintiffs allege the Metro Council "pack[ed] large numbers of Black voters into majority-Black council districts where they constitute an ineffective minority unable to participate equally in the electoral process."[25] Plaintiffs thus seek declaratory, injunctive, and compensatory relief, in addition to an Order instructing the Metro Council to adopt a "redistricting plan for Baton Rouge that includes six districts in which Black voters have an opportunity to elect candidates of their choice."[26]

On October 11, 2024, the City/Parish moved to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim.[27] On August 21, 2025, the Court issued an Order staying and administratively closing this case pending the U.S. Supreme Court's decision in *Louisiana v. Callias*, a case that was poised to have a significant impact on existing

[21] Rec. Doc. No. 1, ¶¶ 49-53.
[22] *Id.* at pp. 39-41.
[23] *Id.* at ¶ 58.
[24] Rec. Doc. No. 20, p. 1.
[25] Rec. Doc. No. 1, ¶ 2.
[26] Rec. Doc. No. 1, pp. 41-42.
[27] Rec. Doc. No. 18.

VRA § 2 jurisprudence.[28] The Supreme Court decided *Callais* on April 29, 2026.[29] On May 27, 2026, the parties filed a *Joint Motion to Reopen Case*[30] along with briefs on the impact of *Callais* on Plaintiffs' claims.[31] The case was re-opened the following day and the instant *Motion* revived for consideration in conformity with the Supreme Court's opinion in *Callais*.[32]

## II. LEGAL STANDARDS

### A. Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction

Federal courts are courts of limited jurisdiction.[33] Without jurisdiction conferred by statute or the Constitution, federal courts lack the power to adjudicate claims.[34] A party may challenge a district court's subject matter jurisdiction by filing a motion to dismiss pursuant to Rule 12(b)(1).[35]

A federal court must consider a motion to dismiss pursuant to rule 12(b)(1) before any other challenge because a court must have subject matter jurisdiction before determining the validity of a claim.[36] The party asserting jurisdiction constantly bears the burden of proof that the jurisdiction does in fact exist.[37] Where the motion to dismiss is based on the complaint alone, the Court must decide whether the allegation in the complaint sufficiently state a basis for subject matter jurisdiction.[38]

---

[28] Rec. Doc. No. 32.
[29] *Louisiana v. Callais*, 146 S. Ct. 1131, 1157 (2026).
[30] Rec. Doc. No. 35.
[31] *See* Rec. Doc. Nos. 36 and 37.
[32] Rec. Doc. No. 38.
[33] *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005).
[34] *Id.*
[35] Fed. R. Civ. P. 12(b)(1).
[36] *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994).
[37] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).
[38] *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

B. Rule 12(b)(6) motion to dismiss for failure to state a claim

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted.[39] In ruling on a Rule 12(b)(6) motion, the Court must accept well-pleaded facts as true and view them in the light most favorable to Plaintiffs.[40] Though a complaint need not contain "detailed" factual allegations, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face."[41] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42]

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[43] Ultimately, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level."[44] Nevertheless, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[45]

## III. ANALYSIS

A. Subject Matter Jurisdiction

The City/Parish argues that Plaintiffs' claim under §2 of the VRA must fail for a lack of standing.[46] Article III standing is a threshold jurisdictional requirement for civil actions

---

[39] Fed. R. Civ. P. 12(b)(6).
[40] *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).
[41] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[42] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[43] *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted).
[44] *Id.*
[45] *Id.* at 556 (internal citation and quotation marks omitted).
[46] Rec. Doc. No. 18-1, p. 8.

in federal court and is rooted in the bedrock constitutional principle that the judiciary's power extends only to cases and controversies.[47] "The irreducible constitutional minimum of standing contains three elements."[48] They are: (1) an injury in fact which is a concrete and particularized invasion of a legally protected interest, (2) a causal connection between the injury and the conduct complained of; that is, the injury has to be fairly traceable to the challenged action of the defendant, and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable judicial decision.[49] At the motion to dismiss stage, "conclusory allegations of injury are not enough to confer standing";[50] nor are allegations of an injury that is merely "conjectural or hypothetical."[51]

The City/Parish argues that because Banks, Hurst, Dunn, Cole, Coleman, and Collins reside in Districts that, under Plan 4B, would remain majority-black Districts, these Plaintiffs have failed to allege a concrete and particularized injury in fact.[52] In support of this argument, the City/Parish cites to Fifth Circuit jurisprudence stating the "alleged harm" in a vote dilution case "arises from the particular composition of the voter's own district, which causes his [or her] vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district."[53] Plaintiffs respond that each of these individuals "reside in … majority-Black districts that have been subjected to packing."[54] The City/Parish counters that, while allegations that Plaintiffs were either cracked or

[47] *Anderson v. 21st Mortg. Corp.*, No. 7:15-cv-200-KC, 2017 WL 11037113, at *3 (W.D. Tex. Mar. 10, 2017).
[48] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[49] *Id.* at 560-61.
[50] *Lowman v. Enters. Fin. Group, Inc.*, No. 3:24-cv-2752-L, 2025 WL 2994737, at *3 (N.D. Tex. Aug. 12, 2025) (internal citation omitted).
[51] *Lujan*, 504 U.S. at 560.
[52] Rec. Doc. No. 18-1, pp. 11-12.
[53] *Anne Harding v. County of Dallas, Tex.*, 948 F.3d 302, 307 (5th Cir. 2020) (quoting *Gill v. Whitford*, 585 U.S. 48, 67 (2018)).
[54] Rec. Doc. No. 20, p. 11.

packed could be sufficiently particularized for purposes of Article III standing, the *Complaint* contains no such allegations.[55]

The City/Parish's point is well-taken—"to the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific."[56] A conclusory and generalized allegation that Plan 4B "accomplishes white entrenchment by packing more than 68.5% of the Parish's Black registered voters into 42% of the Parish's Metro Council districts" does not suffice absent a showing that Plaintiffs' own Districts were subject to such packing.[57] The Court must therefore determine whether the Plaintiffs have stated sufficient facts to allege they would have any greater voting power if the Districts in which they reside—1, 2, 5, 6, 7, and 10[58]—had been apportioned according to one of the pleaded alternative Plans (i.e., that they reside in an *opportunity district*).[59] Only then can each respective Plaintiff be said to have pleaded a "disadvantage to [the voter] as [an] individual"[60] as opposed to "a generalized grievance against governmental conduct of which [the voter] does not approve."[61]

Here, the *opportunity districts* referenced in the Complaint arise from the "multiple maps proposed to the Metro Council during its consideration of the 2025 map that contain six majority black districts"—that is, Plans 5B, 7, and 7A.[62] In deciding whether a plan

[55] Rec. Doc. No. 25, p. 7.
[56] *Whitford*, 585 U.S. at 66.
[57] Rec. Doc. No. 1, ¶ 4.
[58] Rec. Doc. No. 1, ¶¶ 10-16.
[59] *Thornburg v. Gingles*, 478 U.S. 30, 50 n. 17 (1986) ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged practice, they cannot claim to have been injured by that structure or practice."). The Court uses the term "opportunity district" to reference those Districts which, but for the alleged improper redistricting, could have afforded greater voting power to the protected minority class.
[60] *Whitford*, 585 U.S. at 66 (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).
[61] *United States v. Hays*, 515 U.S. 737, 745 (1995).
[62] Rec. Doc. No. 1, ¶ 58; Rec. Doc. No, 20, p. 5.

presents an opportunity district that was impermissibly rejected, the Court looks to the black voting-age ("BVA") population of the relevant Districts.[63] Applied here, it is clear to the Court that Plans 5B, 7, and 7A, afford no greater voting strength to the residents of Districts 2, 5, 6, 7, or 10, than apportioned to them by Plan 4B.[64] More specifically, Plan 5B would create a sixth majority-black from District No. 8, while Plan 7 maps would do so from District 1. Under the Plan 7 maps, more specifically, District 1's BVA population would comprise 52.5% of the district's total population, compared to the white voting-age ("WVA") population, which would constitute 41.9%.[65] By contrast, Plan 4B's apportionment for District 1 includes BVA population that comprises 37.4% of the district's total population, compared to the WVA population's 57.1%.[66]

Plaintiff Montgomery— who resides in District 1—has therefore sufficiently alleged an injury-in-fact for purposes of standing to pursue a vote dilution claim under § 2 of the VRA against the City/Parish.[67] The City/Parish concedes as much.[68] Nevertheless, where multiple plaintiffs seek the same form of relief, "[o]nly one plaintiff is needed to establish standing."[69] That is the case here and the Court need not consider if the other Plaintiffs have sufficiently alleged an injury-in-fact by way of living in Districts that have been subject to packing.[70] That is, the Court need not turn to the "particular composition" of each District and consider whether changes to such are indicative of packing; in any

---

[63] *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006) ("only eligible voters affect a group's opportunity to elect candidates.").
[64] *See* Metro Council website, REDISTRICTING 2022 (https://www.brla.gov/2723/Redistricting-2022) (Plans 4B, 5B, 7, 7A).
[65] *Id.* (Plans 7 and 7A).
[66] *Id.* (Plan 4B).
[67] Rec. Doc. No. 1, ¶ 15.
[68] Rec. Doc No. 18-1, pp. 11-12.
[69] *Town of Chester v. Laroe Est., Inc.,* 581 U.S. 433, 439 (2017).
[70] *See Gill v. Whitford*, 585 U.S. 48, 50 (2018).

event, such is not clearly ascertained from the allegations in the *Complaint*.

The City/Parish next argues that, where a plaintiff "has not established" all three elements of a § 2 vote dilution claim set forth in *Thornburg v. Gingles*, they have likewise failed to establish "the existence of a harm that is redressable by the Court."[71] In support of this argument, the City/Parish cites to the U.S. Supreme Court's decision in *Growe v. Emison*[72] for the proposition that "[u]nless [the *Gingles* factors] are established, there neither has been a wrong nor can there be a remedy."[73] But, as Plaintiffs correctly note, the *Emison* Court involved an appeal from a district court's order "adopting its own legislative and congressional districting plans and permanently enjoining interference of those plans"[74]—simply *Emison* is not a standing case and provides no persuasive authority on standing. In any event, it is axiomatic that "[w]hether a party has standing is a distinct question from whether it has asserted a valid cause of action."[75] The City/Parish's position blurs this distinction and ignores that "[w]hen courts assess standing, they 'assum[e] that on the merits the plaintiffs would be successful in their claims.'"[76] Further, it is well-settled that federal "courts possess the equity power to fashion the relief to remedy the… prior dilution [of voting power] and to give the minority group the opportunity to participate equally in the electoral process."[77] The City/Parish's arguments regarding redressability are, therefore, unpersuasive and rejected.

---

[71] Rec. Doc. No. 18-1, p. 13.
[72] 507 U.S. 25, 40 (1993).
[73] *Id.* at 40-41.
[74] *Id.* at 31.
[75] *Garrison Realty, L.P. v. Fouse Architecture & Interiors, P.C.,* 546 Fed. Appx. 458, 461 (5th Cir. 2013) (citing *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)).
[76] *In re New Era Enters. Inc. Data Incident Litig.*, No. H-25-732, 2026 WL 303547, at *2 (S.D. Tex. Feb. 4, 2026) (quoting *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1211 (5th Cir. 2025)); *see Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (internal citations omitted) ("In analyzing standing we assume that [Plaintiffs are] correct on the merits ….").
[77] *E. Jefferson Coal. for Leadership and Dev. v. Jefferson Par.*, 691 F. Supp. 991 (E.D. La. 1988).

B. §2 of the Voting Rights Act

Section 2 of the Voting Rights Act imposes liability when it is shown, or can be inferred from strong evidence, that a jurisdiction intentionally drew its districts to afford minority voters less opportunity because of their race.[78] To state a claim under §2 of the VRA, Plaintiffs must allege facts sufficient to meet the three preconditions set forth by the *Gingles* Court (the "*Gingles* factors"). First, it must be shown that "a community of minority voters [is] sufficiently numerous and compact to constitute a majority in a reasonably configured district."[79] It is not sufficient, however, to show "only that [a jurisdiction] *could* create an additional minority-district."[80] As such, where Plaintiffs look to satisfy the first *Gingles* factor by providing an illustrative map with their "desired number of majority-minority districts," it must additionally be shown that: (1) race was not used as a districting criteria in the illustrative map, and (2) the map meets all of the jurisdictions' "legitimate districting objectives, including traditional districting criteria and the [jurisdiction's] specified political goals."[81] Only upon meeting both these conditions may the Court conclude Plaintiffs' allegations successfully "disentangle race from the [City/Parish's] race-neutral considerations"—the failure to do so is fatal to a § 2 claim.[82]

The second and third *Gingles* factors are often discussed together. The second requires Plaintiffs to allege facts sufficient to show "the minority … is politically cohesive."[83] The third is that "the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate."[84] To satisfy these preconditions,

[78] *Louisiana v. Callais*, 146 S. Ct. 1131, 1157 (2026).
[79] *Id.* at 1159.
[80] *Id.*
[81] *Id.*
[82] *Id.* at 1157.
[83] *Id.* at 1146 (citing *Gingles*, 478 U.S. at 51).
[84] *Id.*

Plaintiffs "must provide an analysis that controls for party affiliation … in other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation."[85] Such is, once again, critical for "disentangl[ing] race and politics."[86]

If it is determined that Plaintiffs have alleged facts sufficient to satisfy all three *Gingles* preconditions, the Court may, lastly, proceed to a "totality of the circumstances" inquiry to determine if there is "present-day intentional racial discrimination regarding voting."[87] In conducting this inquiry, the U.S. Supreme Court has instructed that evidence of "[d]iscrimination that occurred some time ago" and "disparities that are characterized as the ongoing effects of societal discrimination" are entitled to "much less weight."[88] While such information may certainly be considered, "far more germane" to the Court's analysis is "current data and current political conditions that shed light on current intentional discrimination."[89] "[C]urrent intentional discrimination" is the chief evil identified by the Supreme Court.[90] Thus, the principal question before the Court is whether the allegations of the *Complaint* plausibly allege intentional discrimination in the redistricting.

1. <u>*Gingles* 1</u>

Plaintiffs allege that the first *Gingles* factor is satisfied because "size and compactness are evidenced by … the multiple maps proposed to the Metro Council during its consideration of the 2025 map that contain six majority black districts."[91] Of

[85] *Id.* at 1159.
[86] *Id.*
[87] *Id.* at 1160.
[88] *Id.*
[89] *Id* (internal citations and quotation marks omitted).
[90] *See id.* at 1162.
[91] Rec. Doc. No. 1, ¶ 58.

these maps, Plaintiffs only provide an illustration of Plan 7A.[92] That said, to the extent the Court must draw all reasonable inferences in favor of Plaintiffs, their reference to "multiple maps" inferentially contemplates Plans 5B and 7—which also add a sixth majority-minority district—thus, the Court will consider their import on Plaintiffs' burden at the pleadings stage.[93] With respect to Plans 7 and 7A, the City/Parish argues that these maps "were drawn with the sole objective of creating a Black-majority district" and, thus, are "contaminated by the taint of race-based redistricting."[94] The City/Parish argues that Plan 5B suffers from this same infirmity to the extent it differs only slightly from its parent map, Plan 5, which Hefner introduced as the result of "aggressive modeling to see what could be done to add another majority-minority district to the Council demographics."[95] In response, Plaintiffs note that the City/Parish makes these assertions "without citation to any sworn evidence."[96]

The City/Parish's point is well taken. Plaintiffs allege no facts to plausibly show that their relied upon illustrative maps 5B, 7, and 7A, did not use race as a districting criterion. The public records, of which the Court takes judicial notice, reveal that racial considerations did, in fact, play a significant role in the creation of these illustrative maps. With respect to Map 5B, for example, Hefner's presentation of Plan 5, the parent to 5B, explicitly noted that the "aggressive modelling" needed "[t]o even get slightly above a 50% Black total population required considerable changes in the district boundaries."[97]

---

[92] *Id.* at p. 11.
[93] Notwithstanding their status as public records, the Court may properly consider these maps to the extent they are "referred to in the plaintiff's complaint and are central to [the plaintiffs'] claims. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).
[94] Rec. Doc. No. 18-1, pp. 15-16.
[95] *Id.* at p. 16.
[96] Rec. Doc. No. 20, p. 7.
[97] Rec. Doc. No. 18-5, p. 1.

"Especially impacted" by these changes, according to Hefner, was District No. 8—which Plan 5 includes as a toss-up district with a BVA population of 47% and Plan 5B renders a majority-minority one with a BVA population of 51.6%.[98] Tellingly, at the June 29, 2022 redistricting workshop, Hefner voiced concern on the priority that racial considerations had been given in drawing District 8 for purposes of Plan 5, stating:

> "I had a little concern with the way that we had to really go outside the normal range of boundaries … because we were mostly making these changes based on how it affected our racial percentages in those districts and [the] Supreme Court over the years has been fairly specific on that interpretation of the [VRA]."[99]

Plaintiffs fail to plausibly allege facts which show that race was not used as a districting criterion in the creation of Plan 5B. While it is true that Hefner's comments were directed at Plan 5B's parent map—Plan 5—specifically, it is glaring to the Court that Plan 5B went further than its parent map did in changing the composition of District 8 so as to achieve a higher total BVA population. Plan 5B is, therefore, "an illustrative map in which race was used" and "has no value in proving a § 2 plaintiff's case."[100]

The same is true for Plans 7 and 7A. Notably, Hefner's memorandum for Plan 7 notes that the map is responsive to the request that he "work up a plan that added an additional majority-minority district using District 1 as the new district."[101] He explicitly states that "the decisions on which precincts to add or take out were based solely on race and how it would affect the targeted Black percentages for District 1."[102] Accordingly, Plan

---

[98] *Id.*
[99] June 29, 2022 Redistricting Workshop, https://batonrougela.news.swagit.com/videos/179153 (1:39-2:10).
[100] *Callais*, 146 S. Ct. at 1159.
[101] Rec. Doc. No. 18-6, p. 1.
[102] *Id.*

7 was able to achieve a BVA population percentage of 52.5% for that district.[103] Precisely the same BVA population percentage for District 1 is achieved in Plan 7A.[104] Tellingly, Plans 7 and 7A reach this configuration for District 1 in the same way, which was explained at the July 27, 2022 redistricting workshop: "*District two, in order to make up for the difference of the minority population [in District 1] … had to go out toward the central area and start picking up [the non-black] population*."[105] Indeed, the only difference between Plans 7 and 7A is the former's placement of Precinct 2-11 in District 2, whereas the latter places it in District 5—as such, no change occurs in the demographics of District 1 (i.e., the opportunity district).[106] Accordingly, the City/Parish is correct in that both Plan 7 and Plan 7A are "contaminated by the taint of race-based redistricting."[107] The public record documents Hefner's word of caution to the Metro Council on this very point, stating: "Districts 1 and 2 [are] indicative that race played a more predominate factor than just making what changes were necessary to rebalance the districts [in Plan 7]."[108] The Plan 7 maps were thus produced by "a process that would be unconstitutional if a [jurisdiction] engaged in such mapmaking," as Hefner warned, and cannot be relied upon by Plaintiffs to satisfy the first *Gingles* factor.[109]

To the extent Plaintiffs present only the "multiple maps presented to the Metro

---

[103] Metro Council website, REDISTRICTING 2022 (https://www.brla.gov/2723/Redistricting-2022) (Plan 7).
[104] *Id.* (Plan 7A).
[105] July 27, 2022 Redistricting Workshop, https://batonrougela.news.swagit.com/videos/179154 (0:00-1:00).
[106] *See* Metro Council website, REDISTRICTING 2022 (https://www.brla.gov/2723/Redistricting-2022) (Plan 7 and Plan 7A); rec. Doc. No. 18-1, p. 15.
[107] Rec. Doc. No. 18-1, p. 15. Tellingly, when summarizing his efforts to create Plan 7, Hefner explicitly noted for the Metro Council that "the objective" was "creating an additional majority-minority district." Rec. Doc. No. 18-6, p. 1. Further, he cautioned the Metro Council the Supreme Court has "struck down plans that used race as the primary or sole criteria in determining which voters are added to or taken out of a district." *Id.*
[108] Rec. Doc. No. 18-6, p. 1.
[109] *Callais*, 146 S. Ct. at 1159.

Council … that contain six majority black districts" to satisfy the necessary precondition of "size and compactness [,]" Plaintiffs have failed to allege sufficient facts to plausibly meet the first *Gingles* factor and, thus, to state a claim for relief. The Court must dismiss Plaintiff's § 2 claim on that ground.

C. Fourteenth and Fifteenth Amendments

Count two of Plaintiffs' *Complaint* challenges the Ordinance as a violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution.[110] The Equal Protection Clause of the Fourteenth Amendment prohibits State action that "den[ies] to any person within its jurisdiction the equal protection of the law."[111] The Fifteenth Amendment provides that "[t]he right of citizens … to vote shall not be denied or abridged … by any State on account of race, color, or previous condition of servitude."[112] The focus of the analytical frameworks for intentional vote dilution cases under both the Fourteenth and Fifteenth Amendments is the same.[113] To state a claim for intentional vote-dilution under the Constitution, "a plaintiff must plead that the challenged redistricting plan was enacted with a discriminatory purpose and has discriminatory effects."[114] The gravamen of such claims, therefore, is that "a particular voting scheme [was enacted] as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities."[115]

---

[110] Rec. Doc. No. 1, p. 40.
[111] U.S. Const., Amend. XIV.
[112] *Id.*, Amend. XV.
[113] *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997) ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose.").
[114] *Petteway v. Galveston, Cnty.*, 667 F. Supp. 3d 447, 469-70 (S.D. Tex. 2023) (citing *Harding*, 948 F.3d at 312).
[115] *Id.* at 470. The Supreme Court has identified a nonexclusive and nonexhaustive list of factors to consider in determining racially discriminatory intent, including: (1) whether the impact of the decision bears more heavily on one racial group than another; (2) contemporaneous statements by the decisionmakers; (3) the historical background of the decision; (4) the sequence of events leading up to the decision and (4) whether the decision departs from the normal practice. *Village of Arlington Heights v. Metro.Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).

The City/Parish argues that "[t]he *Complaint* does not contain any allegation that the Metro Council had any discriminatory intent when it enacted the Ordinance."[116] Plaintiffs respond by directing the Court to their "crystal-clear" allegation of discriminatory intent, which asserts: "Defendants approved [Plan 4B] so as to dilute the votes of Black voters and thereby treat voters unequally under its laws."[117] Plaintiffs contend that this statement sufficiently alleges the Metro Council "singled out a particular group for disparate treatment and selected [its] course of action at least in part for the purpose of causing its adverse effect on an identifiable group."[118]

The Court disagrees—Plaintiffs' "statement of discriminatory intent" is conclusory and, without reference to specific facts, does not suffice to allege a violation of the Constitution based on intentional discrimination.[119] A fair reading of the *Complaint*, however, identifies several factual allegations that tend to support Plaintiffs' claim for present day intentional discrimination—the "linchpin" for stating a claim under the Fourteenth and Fifteenth Amendments.[120] The Court addresses each in turn.

First, Plaintiffs allege the Metro Council's adoption of a map "that would place 60% of the Metro Council seats in white-majority [D]istricts,"[121] despite the fact that "the white voting population of [EBRP] has declined such that they are no longer the majority of

---

[116] Rec. Doc. No. 18-1, p. 24 (emphasis added).
[117] Rec. Doc. No. 20, p. 12 (citing Rec. Doc. No. 1, ¶ 187).
[118] Rec. Doc. No. 20, p. 12.
[119] *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 623 (N.D. Tex. May 18, 2017) ("Allegations of discriminatory intent that are merely conclusory without reference to specific facts will not suffice.") (cleaned up and internal citation omitted); *Cousin v. Day*, No. 00-cv-3602, 2001 WL 34059380, at *11 (E.D. La. Nov. 19, 2001) ("Conclusory allegations ... by themselves do not establish an equal protection violation without proof of invidious discriminatory intent.").
[120] *Louisiana v. Callais*, 146 S. Ct. 1131, 1160 n.2 (2026) (stating that the dissenting opinion's suggestion that the majority's constitutional analysis is based only on the Fifteenth Amendment, and not at all on the Fourteenth either "appears to forget—or at least tries to lead readers to forget—that the decision before us is based on the Fourteenth Amendment.").
[121] Rec. Doc. No. 1, ¶ 185.

voters in the Parish."[122] This is not enough. It is well-settled that "disproportionate impact [or discriminatory effect] cannot be the sole touchstone of an intentional discrimination claim."[123] Yet, that is all that can be gleaned from the proportion of Metro Council seats the Ordinance situates in majority-white Districts.

Allegations that the Metro Council could have adopted "multiple maps" which increased the number of majority-minority Districts is no more availing. Instructively, the *Callais* Court expressly cautioned against inferring an impermissible motive when all that is shown is that a jurisdiction "*could* [have] create[d] an additional majority-minority district," but ultimately did not.[124] Thus, even if Plaintiffs had presented the Court with alternative maps that otherwise comport with the constitutional requirements for redistricting—which it does not—"the [alleged] existence of less dilutive options [is] … not dispositive of" discriminatory purpose.[125] This same reasoning applies to the Metro Council's rejection of Plan 6A and the option of a "toss-up district," which Hefner commented "may be a plan that has a fair representation of the Black population in the Parish."[126] Plaintiffs construing this language to allege Hefner "acknowledged that retaining seven white districts would not be a fair representation of the Black population" is misleading and unpersuasive. First, "fairness" is not the legal test. Second, a tip of the

[122] *Id.* ¶ 184.
[123] *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 728 (S.D. Tex. 2017).
[124] *Callais*, 146 S. Ct. at 1159; *see Turner v. McKeithen*, 490 F.2d 191, 197 n.24 (5th Cir. 1973) ("A minority group is not constitutionally entitled to one or more 'safe' or majority districts simply because an apportionment scheme could be drawn to reach this result.").
[125] *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 490 (1997); *see Callais*, 146 S. Ct. at 1159. If anything, the Metro Council's rejection of Plans 5B, 7, and 7A could, very well, have been an attempt to ensure compliance with the Supreme Court's jurisprudence cautioning against the use of race as a predominant factor in redistricting processes—which, as previously discussed, was the case for these maps. As previously noted, Hefner expressly warned the Metro Council of this consideration on several occasions.
[126] Rec. Doc. No. 18-7, p.1.

fairness scale does not give rise to an inference of discriminatory purpose.[127]

"Purposeful discrimination requires more than … intent as awareness of consequences."[128] Alleging the adoption of Plan 4B was done "in spite of" an awareness that a more fair apportionment could have been achieved does not allege the Metro Council undertook that course of action "because of its adverse effect" on an EBRP's black population.[129] It is well-settled the Constitution does not require an apportionment structure specifically designed to maximize any identifiable group's political advantage—majority or minority.[130] As such, the mere failure to provide such a structure, without more, is not (and cannot be) suggestive of a constitutionally proscribed purpose.

Plaintiffs' pleaded comments from Metro Council's members that voted against the creation of a sixth majority-minority district, likewise, do not suffice to show a discriminatory purpose. While probative in theory, the Fifth Circuit has consistently warned against crediting the stray statements of a few individual lawmakers as indicia of a legislative purpose.[131] Even then, the relied-upon statements would need to have some bearing on the legislative body's harboring a discriminatory or invidious purpose in its contemplation of the challenged action. That is not what is alleged here. Councilmember Laurie Adam's comment that "splitting certain neighborhoods would break up

---

[127] The Court finds the following district court's statement—though it arises in a distinct context where discriminatory purpose must be shown—to be persuasive on this point: "[n]ot every unfair or arguably unreasonable conduct by the state or under color of state law includes the invidious motivation of racial discrimination as a part of the decision making process." *Stokes v. N.Y. State Dept. of Correctional Servs.*, 569 F. Supp. 918, 925 (S.D.N.Y. 1982).
[128] *Ahmed v. Warden*, No. 1:24-cv-1111, 2025 WL 4718807, at *2 (W.D. La. Feb. 24, 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009)).
[129] *Id.*
[130] *Turner v. McKeithen*, 490 F.2d 191, 197 (5th Cir. 1973); *League of United Latin Am. Citizens v. Abbott*, 369 F. Supp. 3d 768, 777 (W.D. Tex. 2019).
[131] *Jones v. City of Lubbock*, 727 F.2d 364, 371 n.3 (5th Cir. 1984) (refusing to infer legislative intent from the statements of a single member); *Artisan/Am. Corp. v. City of Alvin*, No. 4:07-cv-2899, 2008 WL 8894683, at *7 (S.D. Tex. Nov. 19, 2008) ("an isolated comment by one decision-maker on a multi-member board … does not support a finding of discriminatory intent.").

communities with common interests and make it more difficult for them to advocate for themselves"[132] reflects only the consideration of a permissible topic—"[t]he Supreme Court … has repeatedly taken communities of interest to be a relevant factor."[133] Likewise, the fact that Councilmember Rowdy Gaudet voted in favor of the Ordinance despite earlier acknowledging that "I've looked at the population numbers and (my district) saw a tremendous increase and bec[a]me more diverse"[134] says nothing to suggest his vote was prompted by a desire to subvert the political strength of, or otherwise disadvantage, those diverse communities.

Lastly, the Court considers Plaintiffs' allegation that the Metro Council "overrode" Hefner's recommendation to use the "Any Part Black" method for counting EBRP's black population for purposes of redistricting and instead chose an alternative that "excluded residents who identify as Black and Hispanic" ("non-[H]ispanic DOJ Black" or "NH_DOJ_Blk").[135] Importantly, the relevant inquiry is not whether the "Any Part Black" methodology was the most appropriate method for counting EBRP's Black population, but whether the Metro Council's choice to have NH_DOJ_Blk be its primary method for doing so during the redistricting process is sufficient to plausibly allege discriminatory purpose. The Court concludes that it is not.

First, the public record reveals that Hefner never recommended a methodology in which "residents who identify as Black and Hispanic" are included as part of EBRP's total Black population. Instead, Hefner informed the Metro Council in a post-workshop memorandum that two "permissible" aggregation sub-types could be used for counting

---

[132] Rec. Doc. No. 1, ¶ 163.
[133] *Prejean v. Foster*, 227 F.3d 504, 513 n.15 (5th Cir. 2000).
[134] Rec. Doc. No. 1, ¶ 164.
[135] Rec. Doc. No. 1, ¶¶ 166-73.

the Black community for redistricting purposes.[136] The first would "include Black as a single or any other race" (i.e., Any Part Black), to be compared against the population classified as "No Part Black."[137] The second would "be just Black and White."[138] At the February 22, 2022 workshop, however, Hefner explained to the Metro Council that, under either methodology, his use of the phrase "Black" or "Any Part Black" traditionally reflects "DOJ non-Hispanic black."[139] For the second aggregation (i.e. "just Black and White"), specifically, Hefner informed the Metro Council that it could elect to count EBRP's Black population as "single race Black" instead of "Any Part Black"—counting only those who checked "Black" and no other race for the 2020 Census.[140] This, he explained, would result in EBRP's Black population being lower. In any event, Hefner explained to the Metro Council that the Justice Department's "Any Part Black" methodology—which excludes those who identify as Hispanic and Black—is "the most generous category and cast[s] the widest net." Further, Hefner's post-workshop memorandum provided a chart reflecting the "2020 Demographics for Current Districts"[141]—in that chart, EBRP's black population was accounted for in line with the "2020 Census Counts" as "**NH AP Blk**" and **"NH 18+ AP Blk**."[142]

Thus, it is clear that when Hefner's post-workshop memorandum informed the Metro Council that the "Any Part Black [methodology] increased the population and therefore the percentage that group has in relation to the overall population total," he did

---

[136] Rec. Doc. No. 18-4, p. 3.
[137] *Id.*
[138] *Id.*
[139] February 22, 2022 Redistricting Workshop, https://batonrougela.news.swagit.com/videos/179139 (45:40-45:51) ("I actually do White and I do Black, according to the … Any Part Black that … in 2010 … was the DOJ non-Hispanic Black.").
[140] *Id.*
[141] Rec. Doc. No. 18-4, p. 1.
[142] *Id.*

so in the context of his workshop explanation that "Any Part Black" is synonymous with the Justice Department's "non-Hispanic black" classification—that is, it would account for those who selected "Black" and any other race, except Hispanic, for the 2020 Census.[143] Thus, Plaintiffs' allegation that the Metro Council "overrode Hefner and chose not to use the Any Part Black counting method" so as to exclude a segment of the Black-identifying population is squarely inconsistent with the public record and cannot be credited.[144]

Plaintiffs have thus failed to allege facts sufficient to suggest the Metro Council's adoption of Plan 4B was the product of a discriminatory purpose. Accordingly, the Court cannot conclude, or reasonably infer, that present day intentional discrimination has been pleaded. The Court acknowledges Plaintiffs' thoughtful and thorough recounting of the history of voting discrimination endured by African Americans in Louisiana and, specifically, in Baton Rouge. It is undeniable that the stain of generations of racial oppression is still visible in our society and deeply felt. The Supreme Court's recent opinion in *Callais*, however, makes clear that, notwithstanding a "sordid history of intentional discrimination [,]" the sine qua non of a vote-dilution constitutional claim must be the "current conditions" it challenges—in other words, the instant redistricting process.

## III. CONCLUSION

For the foregoing reasons, Defendant's *Motion to Dismiss*[145] is GRANTED and Plaintiffs' claims under § 2 of the Voting Rights Act and the U.S. Constitution are DISMISSED without prejudice.[146] Plaintiffs shall have 30 days from the date of this Ruling

---

[143] Rec. Doc. No. 18-4, p. 3.
[144] *In re CrowdStrike Holdings, Inc. Securities Litig.,* 816 F. Supp. 3d 683, 699 (W.D. Tex. 2026) (recognizing courts "cannot credit a plaintiff's allegations contradicted by … facts subject to judicial notice or incorporated by reference.").
[145] Rec. Doc. No. 4.
[146] Rec. Doc. No. 18.

to amend the deficiencies noted herein.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 15th day of September, 2026.

*Shelly D. Dick*

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**